806 F.2d 1487
 124 L.R.R.M. (BNA) 2232, 55 USLW 2387,
105 Lab.Cas. P 12,151,
22 Fed. R. Evid. Serv. 421
 UNITED STATES of America, Plaintiff-Appellee,
v.
James CAPORALE, Alfred Pilotto, Seymour A. Gopman, Bernard
Rubin, George Wuagneux, Salvatore Tricario, Louis
C. Ostrer, and John Giardiello,
Defendants- Appellants.
UNITED STATES of America, Plaintiff-Appellee,
v.
Seymour GOPMAN, Salvatore Tricario, George Wuagneux, Louis
C. Ostrer, John Giardiello, James Caporale, Alfred
Pilotto and Bernard Rubin, Defendants- Appellants.
 Nos. 82-5964, 85-5670.
 United States Court of Appeals,
Eleventh Circuit.
 Dec. 31, 1986.
 
 Ronald A. Dion, North Miami, Beach, Fla., for Gopman.
 Thomas Decker, Chicago, Ill., for Tricario.
 John C. Mattes, Appellate Federal Public Defender, Miami, Fla., for Wuagneux.
 Clifford B. Hark, Miami, Fla., for Ostrer.
 Barry M. Fallick, Rochman, Platzer & Fallick, New York City, for Giadiello and Rubin.
 Carl M. Walsh, Chicago, Ill., E. David Rosen, Miami, Fla., for Pilotto.
 Hugh B. Arnold, John J. Toomey, Charles A. Linn, Chicago, Ill., for Caporale.
 Leon Kellner, U.S. Atty., John M. Owens, Sp. U.S. Atty., U.S. Dept. of Justice, Miami, Fla., William C. Bryson, U.S. Dept. of Justice, Office of the Sol. Gen., Washington, D.C., for U.S.
 Appeals from the United States District Court for the Southern District of Florida.
 Before FAY and JOHNSON, Circuit Judges, and HOFFMAN,* Senior District Judge.
 JOHNSON, Circuit Judge:
 
 
 1
 This is a consolidated appeal brought by eight defendants-appellants challenging their convictions pursuant to a one count indictment for conspiracy to violate the federal anti-racketeering statute (RICO). All eight appellants were officers of or somehow associated with the Laborers International Union of North America ("the Union"). The government's theory of the case was that the defendants-appellants conspired to receive kickbacks from various insurance or health care service provider representatives in exchange for exercising their influence with the Union to obtain the Union's health and insurance benefits contracts for the companies paying kickbacks.[1] Appellants were convicted by a jury in the Southern District of Florida. We reject the numerous arguments the appellants advance on appeal and affirm the convictions.
 
 I. FACTS
 
 2
 The scheme began in 1970, when the Union's Chicago Local decided to institute a dental care program for its members. Representatives of the Local's Health and Welfare Fund, including Angelo Fosco[2] and appellant James Caporale,[3] arranged to give the contract to Consultants and Administrators, Inc. ("C & A"), a company with no clients, equipment, or experience. Defendant-appellant Alfred Pilotto[4] also helped get the contract for C & A. Angelo Fosco and Daniel Milano, Sr., an auditor with the Chicago Local, each owned 20% of C & A's stock.[5] The Fund trustees did not know that Milano and Fosco had an interest in C & A.
 
 
 3
 In return for getting C & A the contract, Fosco, Caporale and Pilotto received periodic cash payments over a four year span of time.[6] Caporale received 25 cents for each union member covered every month, or roughly $3000 per month. In 1975 alone Caporale received $31,900, while Fosco received $12,800 and Pilotto received $1200. Milano and his son, Daniel Milano, Jr., made the payments at the offices of C & A.
 
 
 4
 In 1972 C & A sought the dental benefits contract for Union members in Florida. Fosco agreed to secure the contract for the Milanos. Milano, Jr., travelled to Florida to meet with defendant-appellants Salvatore Tricario,[7] John Giardiello,[8] Bernard Rubin[9] and Seymour Gopman.[10] The parties agreed that C & A would pay 15% of the contract receipts to the four appellants through a dummy corporation. In exchange, C & A obtained the Florida contract through an entity called Dental/Vision Care Centers ("DVCC").
 
 
 5
 In accordance with this agreement, DVCC made regular payments of 15% of the gross monthly premiums to a series of dummy corporations that funneled the money to Gopman, Rubin, Tricario and Giardiello.[11] The first of these dummy corporations was Fortune Services, a company owned by Gopman, Rubin, Tricario and Giardiello. Fortune Services supposedly performed eligibility checks on union members on behalf of DVCC, although it did not in fact perform that service. In fact, Fortune Services had no office or professional staff and was run out of Gopman's law office by his mother-in-law. Each month, Gopman would submit a bill on behalf of the company in the amount of 15% of DVCC's monthly billings.
 
 
 6
 Fortune Services was replaced in 1975 by a corporate conduit called Ace Services, which operated in an identical manner to Fortune Services. In late 1975, Ace Services was replaced by another conduit company called Sales Administrators for Employee Fringe Advantages ("SAEFA"). SAEFA was owned by defendant-appellant Louis Ostrer.[12] SAEFA was paid 15% of DVCC's gross receipts purportedly for soliciting new business for DVCC, although SAEFA did not in fact solicit any new business for DVCC. SAEFA was succeeded by Drake Towers Joint Venture, a development project associated with appellant George Wuagneux's company, Sage Corporation. Like the other conduit corporations, Drake Towers received 15% of DVCC's gross receipts. Wuagneux and Rubin were partners in Drake Towers, and Gopman also was associated with the company. Drake Towers was replaced in turn by Fringe Benefits, Inc., a company owned by Ostrer. The last payments made pursuant to the agreement were made in 1977 to Fringe Benefits, Inc.
 
 
 7
 Meanwhile, as the contract in Florida was running its course, the Fund trustees in Chicago decided to expand the dental coverage and include vision care for its members. In exchange for securing this contract for C & A, Milano, Sr., paid Pilotto 10% of the new premiums through a dummy corporation maintained by James Pinkard, Pilotto's son-in-law. As with most of the Florida conduit corporations, Pinkard's company received the kickbacks under the guise of payments due for services purportedly rendered checking members' eligibility.
 
 
 8
 Between 1970 and 1973, a man named Joseph Hauser discussed setting up a life insurance company with Terence O'Sullivan, vice-president of the International Union. The two men agreed that if Hauser could set up a company that could write policies on a nationwide basis, O'Sullivan would use his influence to get business for the company in exchange for stock in the company and kickbacks. Hauser also met with Caporale, Fosco, Tricario and Giardiello about setting up business in Florida and in the midwest, and again the parties agreed to exchange business for kickbacks and stock.
 
 
 9
 In 1973 Hauser purchased the Farmers National Life Insurance Company in Florida. Gopman helped with the legal work and assisted in bribing the Florida Insurance Commissioner to facilitate the purchase. Hauser reached an agreement with Rubin that Hauser would pay a 15% kickback in exchange for the life insurance business of the Union locals in Florida. Gopman and Rubin also received stock in the insurance company as part of the deal, and Hauser paid Gopman's law firm a $2500 monthly retainer, although no services were actually rendered. After the contracts were awarded to Farmers, Hauser began making regular payments to Rubin, Gopman, Tricario, Giardiello, Fosco and O'Sullivan, as well as making supplemental payments at various times and buying them cars and jewelry, among other things. Rubin set up a dummy corporation associated with Farmers that laundered $250,000 in payments from Hauser.
 
 
 10
 In 1974 Fosco arranged for Hauser to get the midwest contract. Hauser's company paid monthly amounts to a dummy corporation run by Fosco's son, supposedly as commissions for policies written by the dummy corporation. This amount was later supplemented with $36,844.36 because "the outfit" was upset that not enough money was coming in. Fosco also arranged for the Indiana Union contract to be awarded to Hauser, again utilizing the dummy corporation run by Fosco's son to funnel kickback payments from Hauser.
 
 
 11
 In 1976 Hauser agreed to pay Caporale $25,000 plus 25 cents per member per month in exchange for the contract to reinsure all of the Chicago union insurance business, including the C & A dental clinics. Although Hauser actually paid $15,000 of that amount, the contract never materialized because Farmers began to experience financial troubles.
 
 II. PRIOR PROCEEDINGS
 
 12
 Indictments were returned for sixteen individuals allegedly implicated in the scheme described above. Five of the defendants were severed prior to trial and are not appellants here.[13] The remaining defendants went to trial before a jury in the Southern District of Florida on a one count indictment charging all eleven defendants with conspiracy to violate the federal racketeering statute, 18 U.S.C.A. Sec. 1962(d). Three of the defendants were acquitted,[14] while the remaining eight, the appellants here, were convicted.
 
 
 13
 The trial court sentenced all of the defendants to various periods of incarceration and, in addition, ordered Gopman, Tricario, Giardiello, and Rubin to forfeit $1,254,964.80 funneled to them through various corporations as part of the kickback scheme. The trial court also ordered Pilotto to forfeit $595,701.90 funneled to a company controlled by his son-in-law as part of the kickback scheme.
 
 
 14
 Several weeks after the verdict in this case was returned, a Miami newspaper reported that the government was conducting an investigation into allegations of jury tampering. The defendants moved for a new trial and other relief based on the news report. The district court denied the motions.
 
 
 15
 All eight defendants appealed and full briefs were filed under the case number 82-5964. Since the government stated in its brief that it would not oppose a remand to the district court for the limited purpose of conducting an evidentiary hearing on the jury tampering issue, this Court remanded the case for that purpose. The trial court held six days of hearings on the claim and all jurors and alternates testified or were deposed. In addition, the court took evidence from FBI agents and a federal prosecutor who investigated the jury tampering claim, and from several persons identified as possible sources of the rumor. The trial court concluded that the defendants had failed to demonstrate by a preponderance of credible evidence that any extrinsic matter had tainted the jury's deliberation. That matter comes back on appeal as case number 85-5670 and is consolidated with the appeal on the merits.
 
 III. DISCUSSION
 
 16
 The appellants' briefs taken as a whole raise twelve distinct points of appeal.[15] These points will be discussed seriatim in order of significance.
 
 A. Sufficiency of the Evidence
 
 17
 The appellants argue that the evidence presented at trial was insufficient to support their convictions for conspiracy to violate RICO in three respects. First, most of the appellants argue that their participation in an "enterprise" was not properly proved because there was a material variance between the enterprise alleged in the indictment and the enterprise actually proven at trial.[16] Second, Gopman claims that there is no evidence that he was involved in the conspiracy during the period of time charged in the indictment. Third, Ostrer and Wuagneux claim that the evidence at trial was insufficient to tie them to the conspiracy. In reviewing these claims of insufficiency of the evidence, we must make all inferences and credibility choices in support of the jury verdict and examine whether a reasonable trier of fact could find that the evidence presented at trial established guilt beyond a reasonable doubt. United States v. Perkins, 748 F.2d 1519, 1526 (11th Cir.1984); United States v. Alonso, 740 F.2d 862, 872 (11th Cir.1984), cert. denied, 469 U.S. 1166, 105 S.Ct. 928, 83 L.Ed.2d 939 (1985).
 
 
 18
 1. Variance between indictment and proof at trial
 
 
 19
 Appellants argue that the district court erred by instructing the jury that the enterprise consisted solely of the International Union when in fact the evidence failed to establish that the appellants conspired to participate in the affairs of the International Union. The appellants contend that instead of establishing a single conspiracy run through a single enterprise, the evidence at trial established the existence of two separate and distinct conspiracies, the "dental" conspiracy, revolving around Caporale, Fosco and Pilotto, and the "insurance" conspiracy, revolving around Hauser's venture into the business of insuring Union members. As a result, appellants contend, there is an impermissible material variance between the indictment and the proof at trial.
 
 
 20
 A "variance" occurs when the evidence at trial establishes facts materially different from those alleged in the indictment. United States v. Johnson, 713 F.2d 633, 643 n. 9 (11th Cir.1983), cert. denied, 465 U.S. 1081, 104 S.Ct. 1447, 79 L.Ed.2d 766 (1984). A variance between allegations and proof is reversible error only when it actually prejudices the defendant. Kotteakos v. United States, 328 U.S. 750, 66 S.Ct. 1239, 90 L.Ed. 1557 (1946); United States v. McCrary, 699 F.2d 1308, 1310 (11th Cir.1983). To evaluate whether reversible error occurred in this case, we must make two inquiries: 1) whether a material variance did indeed occur and 2) if so, whether the appellants suffered substantial prejudice as a result of the variance. Id.; see United States v. Jenkins, 779 F.2d 606, 617 (11th Cir.1986); United States v. Warren, 772 F.2d 827, 835 n. 12 (11th Cir.1985), cert. denied, --- U.S. ----, 106 S.Ct. 1214, 89 L.Ed.2d 326 (1986).
 
 
 21
 The first problem in determining whether a material variance occurred in this case is in determining precisely what the indictment charged. The indictment described the enterprise as the International Union, "including all of its subordinate bodies and affiliated employee benefit plans." In the charge read to the jury, however, the district court declined to give the phrase "including subordinate bodies and affiliated benefit plans" on the grounds that there was no evidence at trial establishing that the International Union had subordinate bodies or affiliated benefit plans. At the same time, the district court refused to strike the same language from the indictment. Throughout the jury instructions the district court characterized the enterprise at issue as the International Union, although it cautioned the jury that its description of the charges was "summary". The court later referred the jury to the indictment for a more complete statement of the charges, which of course defined the enterprise more broadly than just the International Union.
 
 
 22
 The appellants interpret the district court's instruction as requiring the government to prove that all of the racketeering activities alleged were conducted through the International Union proper. It is clear, however, that the jury charge viewed as a whole, which includes the original indictment, establishes that the enterprise charged was not limited to the International Union parent organization alone. Although the district judge omitted the phrase "including its subordinate bodies and affiliated benefit plans" from the charge, he did not strike it from the indictment and later characterized his description of the charges as "summary", referring the jury to the more detailed description in the indictment. The jury could therefore reasonably conclude that the enterprise charged in this case was not limited to the legal entity of the International Union, but that it might consist of something broader. In addition, the term "enterprise" as broadly defined by the statute embraces not only formally defined entities, but associations of entities. See United States v. Thevis, 665 F.2d 616, 625-26 (5th Cir.), cert. denied, 456 U.S. 1008, 102 S.Ct. 2300, 73 L.Ed.2d 1503 (1982). Consequently, the jury could have found that the enterprise involved in this scheme was the International Union and its subordinate or affiliated local bodies and its benefit plans.
 
 
 23
 Assuming however for present purposes that the charge limited the enterprise to the International Union alone, we must still measure the evidence established at trial against the charge to determine whether the proof at trial materially varies from it. Appellants allege that a material variance occurred in two ways: first, that the proof at trial established two distinct conspiracies rather than one and, second, that in any event the evidence did not establish a conspiracy operating through the enterprise charged.
 
 
 24
 The analysis for both contentions is the same: even if the evidence arguably establishes multiple conspiracies,[17] there is no material variance from an indictment charging a single conspiracy if a reasonable trier of fact could have found beyond a reasonable doubt the existence of the single conspiracy charged in the indictment. United States v. Jenkins, supra, 779 F.2d 616-17 (quoting United States v. Cole, 755 F.2d 748, 764 (11th Cir.1985)); United States v. Plotke, 725 F.2d 1303, 1308 (11th Cir.), cert. denied, 469 U.S. 843, 105 S.Ct. 151, 83 L.Ed.2d 89 (1984). In determining whether a reasonable trier of fact could have found a single conspiracy, the courts in this Circuit have looked at three factors: 1) whether a common goal existed, 2) the nature of the scheme, and 3) overlap of participants. Jenkins, supra, 779 F.2d at 617; United States v. Lee, 695 F.2d 515, 518 (11th Cir.), cert. denied, 464 U.S. 839, 104 S.Ct. 130, 78 L.Ed.2d 125 (1983).
 
 
 25
 We conclude that there was not a material variance in this case. A reasonable trier of fact could have found that the evidence presented at trial established that Caporale, Pilotto, Gopman, Rubin, Tricario, and Giardiello conspired to use their positions of authority in the Union organization as the means to commit the predicate kickback offenses. Appellants Wuagneux and Ostrer likewise conspired to promote the kickback scheme by taking advantage of the other appellants' positions of influence within the Union organization. The "dental care" branch of the conspiracy began when Fosco, Caporale and Pilotto, all officers of or representatives to the International Union, sought to take advantage of their influence within the Union by steering the Union members' benefit plan contracts to C & A, a company prepared to pay kickbacks to them. Similarly, the "insurance" branch of the conspiracy began when Fosco, O'Sullivan, Coia, Tricario and Giardiello, also officers of or representatives to the International Union, persuaded Hauser to go into the insurance business with the promise that they would use their influence in the Union to obtain contracts for Hauser in exchange for kickbacks. A reasonable trier of fact considering this evidence could have found that the appellants in both branches of the conspiracy were operating a single overarching conspiracy through the enterprise of the International Union by making use of the influence of high-ranking officers of or representatives to the International Union to affect the award of insurance benefits contracts for their own personal monetary gain.
 
 
 26
 Even if the evidence did not support the jury's finding of a single conspiracy, thereby creating a material variance between the proof and the indictment, appellants must still show that the variance affected their substantial rights. United States v. Warren, supra, 772 F.2d at 835 n. 12 (11th Cir.1985); United States v. Rodriguez, 765 F.2d 1546, 1553 (11th Cir.1985). The courts have found prejudice to substantial rights from a material variance in two circumstances: 1) where the proof at trial differed so greatly from the charges in the indictment that the defendant was unfairly surprised and had an inadequate opportunity to prepare a defense, see, e.g., United States v. Hall, 632 F.2d 500, 504 (5th Cir.1980), and 2) where there are so many defendants and so many separate conspiracies before the jury that there is a substantial likelihood that the jury would transfer evidence from one conspiracy to a defendant involved in another conspiracy, see, e.g., United States v. Warren, supra, 772 F.2d at 835 n. 12.
 
 
 27
 The appellants have failed to show prejudice from any variance that might have occurred. They cannot claim unfair surprise since the variance did not alter the crime charged, the requisite elements of proof or the appropriate defenses in a significant manner. See United States v. John, 587 F.2d 683 (5th Cir.) cert. denied, 441 U.S. 925, 99 S.Ct. 2036, 60 L.Ed.2d 399 (1979). Appellants were clearly on notice as to the nature of the charges against them and the variance did not affect their ability to prepare a defense. Nor can they show that there is a likelihood that the jury transferred evidence of guilt as to one of the conspiracies to a defendant uninvolved in that conspiracy. Not only is a case involving eleven defendants and two possible conspiracies not so complex by definition that the jury will be unable to segregate the evidence properly[18], but the fact that the jury acquitted three of the eleven defendants on trial is evidence that the jury was indeed able to sift the evidence as to each defendant individually. See Rodriguez, supra, 765 F.2d at 1553 (no proof of prejudicial variance due to jury's inability to segregate evidence where one defendant acquitted on some charges).
 
 2. Gopman's claim of insufficient evidence
 
 28
 Gopman claims that the evidence was insufficient to show that he was involved in the conspiracy within the five year statute of limitations period. In making this argument, Gopman focuses on the "insurance" branch of the conspiracy and points to some evidence that he withdrew from that branch of the conspiracy more than five years before the indictment was issued by advising the Local Fund board of trustees in Florida to pull out of Hauser's company. Gopman's argument fails, however, because it ignores the abundance of evidence establishing Gopman's involvement in the "dental care" branch of the conspiracy within the relevant time frame. Since we conclude that the jury could have reasonably found that the appellants were operating pursuant to a single conspiracy, evidence that Gopman participated in that conspiracy, regardless of which branch, is enough to support his conviction. See Jenkins, supra, 779 F.2d at 616-17.
 
 
 29
 3. Ostrer's and Wuagneux's claims of insufficient evidence
 
 
 30
 Ostrer and Wuagneux also assert claims of insufficiency of the evidence. Both appellants are in a slightly different position from the other appellants because they are not officers of or representatives to either the Local or the International Union. Instead, they operated outside of the Union in setting up and operating conduit corporations for funneling the kickback money to the other appellants. Both Ostrer and Wuagneux admit that DVCC made substantial payments to corporations they controlled, but they contend that the evidence did not establish that the payments had anything to do with the kickback scheme. We reject their claims.
 
 
 31
 Ostrer contends that the only evidence tying him into the kickback scheme was the unreliable hearsay testimony of Milano, Jr., to the effect that Ostrer's company, SAEFA, acted as a conduit for kickback payments and that it never performed the service it purportedly was being paid to provide. The credibility and weight of properly admissible evidence[19] is for the jury to decide, however, and the jury could reasonably find based on Milano's testimony that Ostrer participated in the kickback scheme. Furthermore, Milano, Jr.'s testimony was not the only evidence linking the payments to SAEFA with the conspiracy. Hauser also testified that Ostrer and Wuagneux had told him that they were "laundering" kickback money. In addition, the circumstantial evidence surrounding the payments to SAEFA, such as the amount of the payments and the pattern of successor conduit corporations, supports a finding that Ostrer was implicated in the scheme. United States v. Mosquera, 779 F.2d 628, 630 (11th Cir.1986); United States v. Jenkins, supra, 779 F.2d at 610.
 
 
 32
 Wuagneux makes essentially the same argument, claiming insufficiency of the evidence because of the unreliability of Milano, Jr.'s and Hauser's testimony and the lack of any evidence beyond that testimony establishing that his joint venture project, Drake Towers, was used in furtherance of the kickback scheme. Again, it was within the jury's province to give whatever credibility and weight they thought appropriate to the testimony of both witnesses, and based on that testimony the jury could reasonably find that Wuagneux participated in the scheme. As with Ostrer, the circumstantial evidence surrounding the payments to Drake Towers is consistent with the government's theory of the case.[20]
 
 B. Jury Tampering
 
 33
 The appellants' next point of appeal challenges the district court's ruling in the proceedings on remand investigating the jury tampering allegations. The issue of jury tampering arose after the trial had concluded when a report appeared in a Miami newspaper that a grand jury was conducting an investigation into the possibility that a male juror in a major labor union racketeering case had been given a $200,000 bribe to secure the acquittal of three or four defendants in the case. The district court's six day evidentiary hearing, which consisted of testimony from the jurors at issue, the government officials who investigated the claim of tampering, and various individuals believed to know the source of the rumor, as well as a review of most of the reports and transcripts from the grand jury investigation, turned up no credible evidence suggesting that anyone had actually attempted to bribe or otherwise influence any of the jurors.
 
 
 34
 The hearing did reveal that one of the jurors, John Curtice, both prior to and during deliberations, had made several references to certain friends or relatives he had in the Chicago area purportedly connected with the Mafia. He told some of the other jurors that he spoke with these friends or relatives on a daily basis about the trial. Curtice remarked more than once that his friends in Chicago had told him that some defendants might have to be sacrificed in order to acquit others, and that his Chicago connections were pleased or displeased with how the trial was going.
 
 
 35
 The district court concluded that no tangible evidence supported the allegation that a juror was bribed or otherwise influenced by an extrinsic contact. The court also found that while juror Curtice's remarks were "inappropriate", it was "clear from the testimony that these remarks were perceived for the most part as having been made in jest" and that "these remarks had absolutely no influence upon the jurors in their deliberations." As a result, the court ruled that the appellants failed to prove a prejudicial factual intrusion into the jury's deliberations.
 
 
 36
 The appellants argue that the district court erred in reaching this conclusion in four ways: first, the court erroneously placed the burden of showing that an extrinsic factual matter tainted the jury's deliberations upon the appellants; second, the court erred by not finding that the jury was in fact tainted; third, the court improperly refused to compel the testimony of two reporters involved in the spread of the jury tampering rumor; and fourth, the anti-Italian ethnic bias evident among the jurors warrants a new trial.
 
 
 37
 Appellants' first claim is meritless. The law in this Circuit is well settled that the defendant bears the burden of establishing that an extrinsic contact with a jury in fact occurred. United States v. Winkle, 587 F.2d 705, 714 (5th Cir.), cert. denied, 444 U.S. 827, 100 S.Ct. 51, 62 L.Ed.2d 34 (1979). Once the defendant has proved extrinsic contact, the burden then shifts to the government to demonstrate that the contact was not prejudicial. United States v. Phillips, 664 F.2d 971, 999 (5th Cir.1981), cert. denied, 457 U.S. 1136, 102 S.Ct. 2965, 73 L.Ed.2d 1354 (1982). The district court charged the appellants with the burden of proving that some extrinsic contact with the jury had been made, and concluded that they had failed to shoulder that burden. The court thus correctly allocated the burden of proof.
 
 
 38
 Appellants' second claim is that the district court clearly erred in finding that the jury was not in fact tainted. The district court's conclusion was based on two findings: first, that the appellants failed to produce any evidence whatsoever to show that any outside contact with the jury was made and, second, that any questionable conduct by juror Curtice had no effect on the jury's deliberations.
 
 
 39
 Appellants dispute the first finding by arguing that the phone calls Curtice claimed to receive from relatives or friends in Chicago constitute extrinsic contacts. Since the record does not reflect that the appellants ever established that the phone calls actually took place, or what the content of the phone calls was, we can hardly conclude that the district court erred in determining that no extrinsic contact took place.
 
 
 40
 Appellants dispute the second finding by pointing to portions of the testimony at the evidentiary hearing which they claim establish that the jury was in fact influenced by Curtice's comments. Specifically, appellants claim that four of the jurors testified that they thought Curtice was connected with the mob and that one juror, Dora Swanko, believed Curtice.
 
 
 41
 A review of the transcript does not support appellants' characterization of the testimony. The transcript reveals that the four jurors who supposedly testified that they believed Curtice was associated with the mob actually testified only that Curtice might have told them that he had relatives associated with the mob. All four jurors also testified that they believed that Curtice was joking when he made those statements. Likewise, the transcript reflects that, although Dora Swanko stated that she believed Curtice was receiving phone calls from family members in Chicago, she did not know what the calls were about or believe that the calls were to members of the Mafia. She also testified that she thought Curtice's comments were made in a joking context. Consequently, we affirm the district court's determination that the jury's deliberations in this case were untainted.
 
 
 42
 Appellants also protest the district court's refusal to compel the testimony of two reporters who might have had information on the source of the jury tampering matter, Clyde Wallace and Andy Rosenblatt. In reviewing the appellants' claims, we are mindful that the extent of a district court's inquiry into alleged extrinsic contacts with the jury is committed to the court's sound discretion. United States v. Caldwell, 776 F.2d 989, 997 (11th Cir.1985); United States v. Watchmaker, 761 F.2d 1459, 1465 (11th Cir.1985), cert. denied, --- U.S. ----, 106 S.Ct. 879, 88 L.Ed.2d 917 (1986).
 
 
 43
 Clyde Wallace and Andy Rosenblatt are reporters who wrote articles about the rumors of a grand jury investigation into a $200,000 bribe of a juror. Wallace, living in the Washington, D.C., area, declined to testify citing First Amendment privilege and personal health reasons. Wallace did reveal that his information originated from Terence O'Sullivan, one of the acquitted defendants. Wallace offered a physician's report that his health did not permit travel or deposition, and the district court confirmed that report by appointing an independent physician to examine Wallace. Wallace's health notwithstanding, the court gave appellants twenty days to submit interrogatories which it in turn would order Wallace to answer. Appellants failed to submit the interrogatories until almost three months later. At that point the court refused the request as waived and noted that the interrogatories were not essential for a fair determination of the jury tampering issue because the information Wallace was thought to have had been obtained from O'Sullivan himself.
 
 
 44
 The district court's decision to disallow the interrogatories of Wallace was entirely reasonable. Appellants failed to take advantage of the means made available to them to interrogate Wallace and cannot now claim that their lack of diligence was error on the part of the trial court. Moreover, appellants were able to get the information they sought from Wallace--the source of the jury-tampering rumor--from O'Sullivan, the man Wallace identified as his source. O'Sullivan did testify at the evidentiary hearing, although he denied saying anything about jury-tampering to anyone.
 
 
 45
 Rosenblatt refused to testify at the evidentiary hearing on grounds of reporter's privilege. The trial court held that the appellants failed to show that Rosenblatt's information was otherwise unavailable and that there was a compelling interest in securing his testimony. The standard governing the exercise of reporter's privilege as articulated in Miller v. Transamerican Press, Inc., 621 F.2d 721, 726 (5th Cir.1980), cert. denied, 450 U.S. 1041, 101 S.Ct. 1759, 68 L.Ed.2d 238 (1981), provides that information may only be compelled from a reporter claiming privilege if the party requesting the information can show that it is highly relevant, necessary to the proper presentation of the case, and unavailable from other sources. See In re Selcraig, 705 F.2d 789, 792 (5th Cir.1983). Rosenblatt's article reported that the FBI had received allegations concerning possible tampering, but the FBI agents involved testified themselves at the evidentiary hearing as to the origination of the rumor. The district court did not err in concluding that the appellants failed to show that Rosenblatt had information that was unavailable from other sources or necessary to the proper presentation of the case in light of the fact that the FBI's information was provided to appellants in court.
 
 
 46
 Finally, appellants claim that the jury harbored an ethnic bias against Italians and that this bias entitles them to a mistrial under the principle articulated in United States v. Heller, 785 F.2d 1524, 1527-28 (11th Cir.1986). Appellants contend that the record from the remand proceedings establishes that "insidious, ethnic taunts" took place in the jury room. Juror Curtice testified at the evidentiary hearing that some of the other jurors kidded him about being Italian, usually as part of an exchange with him about his claim to have cousins in Chicago and his Mafioso connections. Curtice also testified that the jurors would occasionally joke about some of the defendants "look[ing] like ... typical underworld" figures.[21]
 
 
 47
 In United States v. Heller, supra, 785 F.2d at 1527-28, a Jewish trial attorney was convicted of tax evasion and falsely subscribing to an income tax return. After a note from the jury foreman during deliberations alerted the court to possible juror misconduct, the court questioned each member of the panel individually. The voir dire revealed that, during the course of the trial and into deliberations, several of the jurors had made a series of anti-Semitic comments and directed ethnic slurs at the defendant, saying things like "... he [the defendant] is Jewish. We are just going to hang him." Id. at 1526.
 
 
 48
 The Court of Appeals for this Circuit declared a mistrial, holding that the jury's ethnic and religious slurs in this case constituted impermissible jury misconduct. Id. at 1527. The court rejected the government's arguments that the anti-Semitic comments were meaningless because they were made in jest on grounds that ethnic humor itself is an expression of prejudice and that the district court's inquiry did not sufficiently establish that ethnic bias did not affect the jury's verdict.
 
 
 49
 We find this case distinguishable from Heller, however. There is ample evidence to establish that the verdicts in this case were not based on ethnic bias, despite the joking among the jury about Italians and the Mafia[22]. The jury in this case deliberated three full weeks to arrive at a verdict, acquitting some of the defendants in the process. Furthermore, not only were two of the jurors themselves Italian, but some of the defendants the jury acquitted were Italian. By the same token, some of the defendants the jury convicted were not Italian. In addition, most of the joking around, which took place on lunch and coffee breaks rather than while the jury was actually deliberating, was directed at Curtice, a juror, rather than at the defendants as was the case in Heller. Although the joking around among the jury members in this context was inappropriate, the record does not indicate that any of the jurors prejudged the guilt or innocence of any of the defendants as the result of ethnic bias.
 
 C. Forfeitures
 
 50
 Appellants Pilotto, Gopman, Tricario, Giardiello and Rubin challenge the propriety of the district court's monetary forfeiture orders on several grounds. The penalty provision of the RICO statute, 18 U.S.C.A. Sec. 1963(a), provides that individuals convicted of violating the statute
 
 
 51
 shall be fined not more than $25,000 or imprisoned not more than twenty years, or both, and shall forfeit to the United States, irrespective of any provision of State law--
 
 
 52
 (1) any interest the person has acquired or maintained in violation of section 1962;
 
 
 53
 * * *
 
 
 54
 * * *
 
 
 55
 (3) any property constituting, or derived from, any proceeds which the person obtained, directly or indirectly, from racketeering activity or unlawful debt collection in violation of section 1962.
 
 
 56
 In accordance with this provision, the district court ordered Pilotto to forfeit the $595,701.90 he had ordered C & A to pay to the conduit corporation run by his son-in-law, James Pinkard. It also entered forfeiture orders against Gopman, Tricario, Giardiello, and Rubin for the $1,254,964.80 paid by DVCC to the succession of conduit corporations in Florida.
 
 1. Pilotto's claim
 
 57
 Pilotto claims that the district court improperly based its forfeiture order against him on a theory of vicarious liability. We need not reach at this juncture the question of whether a forfeiture order may be imposed based on a theory of vicarious liability because it is apparent that the district judge did not in fact base his order on such a theory. The judge made findings of fact based on ample evidence that the payments to Pinkard's corporation were disguised kickback payments to Pilotto. The court also found that Pilotto had in fact received $595,701.90 in proceeds from the illegal scheme through the conduit corporation. Consequently, the district court properly ordered forfeiture of that amount, and Pilotto's challenge to the order is meritless.
 
 
 58
 2. Tricario, Gopman, Giardiello and Rubin--waiver of jury trial
 
 
 59
 Tricario, Gopman, Giardiello and Rubin also challenge the forfeiture order entered against them on grounds that the trial judge misled them into waiving their right to a jury trial on the issue of joint and several liability.[23] We find, however, that the record does not support their contention.
 
 
 60
 The indictment originally sought joint and several liability against all defendants for all the proceeds of the entire scheme. When the trial judge inquired whether any of the defendants wished a jury trial on the question of forfeiture, Gopman and Giardiello waived a jury trial from the outset.[24] Later in the trial, the court rejected the government's broad theory of joint and several liability, and at that point Tricario and Rubin waived jury trials on the forfeiture question.
 
 
 61
 Later still, however, the court allowed the government to offer a narrower theory of joint and several liability limited to Gopman, Rubin, Tricario and Giardiello as joint owners and beneficiaries of kickback payments to the corporations set up in conjunction with the "dental care" branch of the conspiracy. None of the four appellants at this point requested trial by jury on the forfeiture issue or objected that their prior waiver had been conditioned on an understanding that the trial court had rejected joint liability in any form. Under these circumstances we cannot find that the district court misled any of the appellants in any way into waiving their right to a jury trial on the forfeiture issue.
 
 
 62
 3. Tricario, Giardiello, Gopman and Rubin--joint and several liability
 
 
 63
 Tricario, Giardiello, Gopman and Rubin also challenge the forfeiture order on the grounds that it improperly grafted the tort principle of joint and several liability onto the criminal RICO forfeiture provision.[25] The issue of whether a RICO forfeiture can be imposed jointly and severally is an issue of first impression. A review of the statutory scheme as a whole and the purpose of the forfeiture provision, however, persuades us that imposition of joint and several liability in a forfeiture order upon RICO co-conspirators is not only permissible but necessary in these circumstances to effectuate the purpose of the forfeiture provision.
 
 
 64
 Section 1963(a)(1) of U.S.Code Title 18 requires forfeiture to the United States of "any interest ... acquired ... in violation of section 1962." There is no question in this case that the series of conduit corporations in Florida received the kickback payments from DVCC in violation of Section 1962. There is also no question that kickbacks were paid to the conduit corporations for the use and benefit of the four defendants ordered to forfeit the kickbacks. The government conceded, however, that it could not prove how the kickbacks had been allocated among the four defendants. As a consequence, the trial court imposed joint and several liability upon all four defendants for the total amount of kickbacks paid to the conduit corporations. The forfeiture provision, however, is silent on the question of whether a legitimately forfeitable interest may be forfeited through the imposition of joint and several liability.
 
 
 65
 Tricario, Giardiello, Gopman and Rubin argue that imposing joint and several liability is improper for three reasons: 1) the language of the forfeiture provision directs that forfeiture should be imposed upon an individual who violates Section 1962, thereby excluding by negative implication joint and several liability; 2) joint and several liability has never been imposed in a criminal case before; and 3) the doctrine of joint and several liability is inconsistent with criminal law's traditional focus on individual wrongdoing and the practice of fashioning an individual penalty appropriate for that wrongdoing.
 
 
 66
 We are not persuaded by any of these arguments. First, we reject the contention that Section 1963(a)(1) excludes joint and several liability by negative implication. The statute states that individuals convicted of violating Section 1962 shall forfeit any interest acquired as a result of the violation. 18 U.S.C.A. Sec. 1963(a)(1). The four individuals subject to the forfeiture order at issue here, Tricario, Giardiello, Gopman and Rubin, were each convicted of violating Section 1962 and ordered to forfeit the proceeds of the violation. As individuals convicted under Section 1962, they fall squarely within the forfeiture provision. The requirement that a convicted individual forfeit the proceeds from his or her illegal activity in no way implies that the liability may not be imposed in a joint and several fashion.
 
 
 67
 Second, the fact that joint and several liability has never been imposed before in a criminal case does not mean that Congress may not act to provide for such liability.[26] While the statute itself does not expressly state that properly found liability may be imposed in a joint and several manner, the nature of a RICO conspiracy violation and the legislative history of the forfeiture provision indicate that joint and several liability is not only consistent with the statutory scheme, but in some cases will be necessary to achieve the aims of the legislation.
 
 
 68
 RICO is a statute "intended to provide new weapons of unprecedented scope for an assault upon organized crime and its economic roots." Russello v. United States, 464 U.S. 16, 26, 104 S.Ct. 296, 302, 78 L.Ed.2d 17 (1983). The Supreme Court has consistently interpreted RICO's statutory language broadly in order to give effect to Congress's far-reaching legislative intent. See, e.g., Sedima, S.P.R.L. v. Imrex Co., 473 U.S. 479, 105 S.Ct. 3275, 87 L.Ed.2d 346 (1985); United States v. Russello, supra, 464 U.S. at 20-22, 104 S.Ct. at 299-300; see also United States v. Kaye, 556 F.2d 855 (7th Cir.), cert. denied, 434 U.S. 921, 98 S.Ct. 395, 54 L.Ed.2d 277 (1977); United States v. Mazzio, 501 F.Supp. 340 (E.D.Pa.1980), aff'd, 681 F.2d 810 (3rd Cir.), cert. denied, 457 U.S. 1134, 102 S.Ct. 2961, 73 L.Ed.2d 1351 (1982). The legislative history reflects that Congress regarded the ability to reach racketeering profits as key to a successful attack on organized crime. 115 Cong.Rec. 5873, 5884-5885 (1969); S.Rept. No. 225, 98th Cong., 2d Sess., reprinted in U.S.Code Cong. & Ad.News 3182, 3187-88 (1984); United States v. Navarro-Ordas, 770 F.2d 959, 970 (11th Cir.1985), cert. denied, --- U.S. ----, 106 S.Ct. 1200, 89 L.Ed.2d 313 (1986). The forfeiture provision is designed to reach those profits. Id. The provision seeks not only to punish but "to remove the profit from organized crime by separating the racketeer from his dishonest gains." United States v. Russello, supra, 464 U.S. at 27-28, 104 S.Ct. at 302-303; see S.Rept. No. 225, 98th Cong., 2d Sess., reprinted in U.S.Code Cong. & Ad.News at 3374.
 
 
 69
 The critical role the forfeiture provision plays in the Congressional scheme persuades us that joint and several liability may be imposed in these circumstances. If the government were required to determine the precise allocation of racketeering proceeds between two offenders before the court could impose forfeiture, the effectiveness of the remedy would be impaired substantially. The offenders would simply have to mask the allocation of the proceeds to avoid forfeiting them altogether. If the government can prove the amount of the proceeds and identify a finite group of people receiving the proceeds, it defeats the purpose of the provision to hold that the proceeds cannot be forfeited because the government cannot prove exactly which defendant received how much of the pot.
 
 
 70
 Furthermore, permitting joint and several liability in these circumstances would be consistent with the line of cases in this Circuit holding that the government is not required to trace racketeering proceeds to specific assets before imposing forfeiture. See United States v. Navarro-Ordas, 770 F.2d 959, 969 (11th Cir.1985); United States v. Conner, 752 F.2d 566, 575 (11th Cir.), cert. denied, --- U.S. ----, 106 S.Ct. 72, 88 L.Ed.2d 59 (1985). The courts in these cases characterized a forfeiture order as an in personam judgment, holding that if the defendant received proceeds from racketeers, those proceeds are forfeitable regardless of what the defendant did with the proceeds after he received them. Navarro-Ordas, supra, 770 F.2d at 969; Conner, supra, 752 F.2d at 577. Once the defendant receives racketeering proceeds, he bears the burden of satisfying the forfeiture order. Similarly, in this situation the government has established the amount of the proceeds and who received the proceeds. The joint and several liability order simply places the burden of satisfying the order collectively on Tricario, Giardiello, Gopman and Rubin. There is no question that the monies paid to the conduit corporations are forfeitable proceeds: joint and several liability in this context is simply a collection device. Cf. Conner, supra, 752 F.2d at 577 (government's obligation to trace goes to collectibility rather than to type of interest forfeitable).
 
 
 71
 Third, we reject the notion that joint and several liability on a forfeiture is inconsistent with traditional concepts of criminal law and individual responsibility. To begin with, the criminal law does recognize vicarious liability in certain circumstances. For example, a co-conspirator can be punished for a substantive offense committed by one of his co-conspirators so long as the offense is reasonably foreseeable and is committed in furtherance of the conspiracy. Pinkerton v. United States, 328 U.S. 640, 647, 66 S.Ct. 1180, 1184, 90 L.Ed. 1489 (1946); United States v. Michel, 588 F.2d 986, 999 (5th Cir.), cert. denied, 444 U.S. 825, 100 S.Ct. 47, 62 L.Ed.2d 32 (1979). The imposition of joint and several liability on a forfeiture is even less theoretically problematic than vicarious liability for a substantive conviction might be because it goes only to the penalty imposed rather than to the individual's criminal liability. In addition, traditional notions of criminal law are not altogether analogous because RICO itself by design is not traditional criminal law: it represents a radical departure from common law notions of liability and punishment in criminal law in a number of respects.[27] See United States v. Russo, 796 F.2d 1443 (11th Cir.1986); United States v. Cauble, 706 F.2d 1322, 1345 (5th Cir.1983), cert. denied, 465 U.S. 1005, 104 S.Ct. 996, 79 L.Ed.2d 229 (1984). In summary, then, we hold that the district court's imposition of joint and several liability for the forfeiture of the proceeds funneled through the conduits was not improper.
 
 
 72
 Finally, and perhaps most importantly, these four appellants have failed to demonstrate that imposition of joint and several liability is in any way unfair. The district court did not arbitrarily apportion the forfeiture amount among the four defendants; rather, it left for the time being the matter of precise apportionment to the defendants themselves.
 
 
 73
 4. Tricario, Giardiello, Gopman and Rubin--forfeiture for conspiracy conviction
 
 
 74
 Tricario, Giardiello, Gopman and Rubin also argue that forfeiture can be ordered only in connection with a substantive RICO violation, not in connection with a conspiracy conviction. They argue that, since conspiracy does not require proof of a substantive violation of the act, it is inappropriate to impose forfeiture because the government has not proven that the defendants actually received proceeds from the RICO violation--that is, from the agreement. They argue that an agreement alone logically cannot have proceeds.
 
 
 75
 The language and legislative history of the statute plainly indicate that Congress intended to punish a conspiracy to violate RICO with the same tools it made available to punish substantive violations. RICO's penalty provision, 18 U.S.C.A. Sec. 1963(a), provides that each of the three penalties for a RICO violation, imprisonment, fines, and forfeiture, may be imposed for a violation of "any provision of section 1962." The conspiracy provision is found in Section 1962 in subsection (d). Furthermore, the legislative history expressly provides that "Subsection (d) [of section 1962] makes conspiracy to violate (a), (b) or (c) [of section 1962] equally subject to the sanctions of sections 1963 and 1964, below." H.Rept. No. 1549, 91st Cong., 2d Sess., reprinted in U.S.Code Cong. & Ad.News 4007, 4033 (1971).
 
 
 76
 In addition, as a matter of common sense, a court could impose forfeiture only as a penalty for a Section 1962(d) conviction if there were in fact proceeds to forfeit. If a defendant is convicted of conspiracy to violate RICO when he has not in fact received any proceeds from the illegal venture, then forfeiture would be inappropriate because the forfeiture provision only permits forfeiture of "interests acquired or maintained" as a result of a RICO violation. 18 U.S.C.A. Sec. 1963(a)(1). Thus, if an agreement to violate RICO were nipped in the bud, before the conspiracy generated any proceeds, the defendants would not have "interests acquired" that were subject to forfeiture. That is not the case here, however. The government proved at trial that the conspiracy entered into by these appellants yielded over two million dollars in proceeds. Given that the purpose behind the forfeiture provision is to separate the illegal activity from the profits that activity generated, forfeiting proceeds from conspiracies that, in fact, yield proceeds would clearly further that goal.
 
 D. Severance
 
 77
 Caporale, Rubin, Wuagneux and Ostrer argue that they were prejudiced by the district court's failure to grant them a severance from some or all of the other defendants. Fed.R.Crim.P. 14 provides that
 
 
 78
 [i]f it appears that a defendant or the government is prejudiced by a joinder of offenses or of defendants in an indictment or information or by such joinder for trial together, the court may order an election or separate trials of counts, grant a severance of defendants or provide whatever relief justice requires.
 
 
 79
 The grant or denial of a severance is entrusted to the sound discretion of the trial court. United States v. Rivera, 775 F.2d 1559, 1564 (11th Cir.1985), cert. denied, --- U.S. ----, 106 S.Ct. 1275, 89 L.Ed.2d 582 (1986); United States v. Andrews, 765 F.2d 1491, 1498 (11th Cir.1985), cert. denied, --- U.S. ----, 106 S.Ct. 815, 88 L.Ed.2d 789 (1986). The trial judge's decision not to sever a defendant will be reversed only upon a showing of compelling prejudice against which the trial judge was unable to shield the defendant. Id. None of the appellants have made such a showing here.
 
 
 80
 Caporale and Wuagneux argue initial misjoinder. Their argument is predicated on the assumption that the Chicago and Florida conspiracies were two separate conspiracies. We have already concluded, however, that the indictment properly charged a single conspiracy. The general rule is that defendants who are jointly indicted should be tried together, particularly in conspiracy cases. United States v. Alvarez, 755 F.2d 830, 857 (11th Cir.), cert. denied, --- U.S. ----, 106 S.Ct. 274, 88 L.Ed.2d 235 (1985); United States v. Walker, 720 F.2d 1527, 1533 (11th Cir.1983), cert. denied, 465 U.S. 1108, 104 S.Ct. 1614, 80 L.Ed.2d 143 (1984). Joinder of co-defendants in a count charging a single RICO conspiracy violation is permissible, even if different defendants are charged with different acts of racketeering, if the racketeering acts charged are in furtherance of the overarching RICO conspiracy charge. United States v. Rosenthal, 793 F.2d 1214, 1234 (11th Cir.1986); United States v. Sans, 731 F.2d 1521, 1533 (11th Cir.1984), cert. denied, 469 U.S. 1111, 105 S.Ct. 791, 83 L.Ed.2d 785 (1985); United States v. Welch, 656 F.2d 1039, 1051 (5th Cir.1981), cert. denied, 456 U.S. 915, 102 S.Ct. 1768, 72 L.Ed.2d 173 (1982); United States v. Martino, 648 F.2d 367, 385-86 (5th Cir.1981), cert. denied, 456 U.S. 943, 102 S.Ct. 2007, 72 L.Ed.2d 465 (1982). Caporale's activities in Chicago and Wuagneux's in Florida were both in furtherance of the overarching RICO conspiracy count charged in the indictment, and therefore initial joinder was proper. Further, Caporale and Wuagneux have failed to make any showing that the district court's decision to try them together with the other defendants resulted in any prejudice. We find no error here.
 
 
 81
 Rubin argues that he was entitled to a severance from defendant Fosco because they presented antagonistic and mutually exclusive defenses. Rubin was convicted, while Fosco was acquitted. Fosco attempted to prove that he did not participate in the conspiracy by showing that he took measures to remedy the problems that developed as a result of Hauser's insurance contracts with Union affiliates. The key witness for Fosco was Robert Connerton, general counsel for the Union. Connerton testified that Fosco placed Rubin on administrative leave from his post as an international representative following an internal union investigation in 1975. Rubin claims that this testimony prejudiced his defense, which was that he had no knowledge or involvement in the scheme.
 
 
 82
 This Circuit has held that a district court is required to grant a severance where there are two potentially antagonistic defenses only if the conflict between the two defendants is so irreconcilable that the jury will infer that both defendants are guilty solely because of the conflict. United States v. Barnes, 681 F.2d 717, 722 (11th Cir.1982), cert. denied, 460 U.S. 1046, 103 S.Ct. 1447, 75 L.Ed.2d 802 (1983); United States v. Berkowitz, 662 F.2d 1127, 1134 (5th Cir.1981); United States v. Herring, 602 F.2d 1220, 1224-25 (5th Cir.1979), cert. denied, 444 U.S. 1046, 100 S.Ct. 734, 62 L.Ed.2d 732 (1980). To mandate severance, antagonism between the two defenses must be so high that "the jury, in order to believe the core of testimony offered on behalf of [one] defendant, must necessarily disbelieve the testimony offered on behalf of his co-defendant." Berkowitz, supra, 662 F.2d at 1134.
 
 
 83
 Rubin has failed to show that the conflict between his defense and Fosco's defense created the requisite level of antagonism. The focus of Fosco's defense was that he was not a party to the insurance kickback scheme or, in the alternative, that he had withdrawn from the scheme by 1975. This defense did not focus on Rubin or Rubin's role in the conspiracy--in fact, Connerton's testimony about Rubin's removal took only six out of over 400 pages of transcript in three full days of testimony. Furthermore, the trial judge carefully limited Connerton's testimony to minimize the prejudice to Rubin, advising the witness to omit or limit his reference to Rubin. Connerton's testimony about Rubin did not go into Rubin's role in the matter or the nature of the internal investigation that brought about his removal. When viewed in context, Connerton's testimony cannot be fairly described as so antagonistical to Rubin's defense that the jury would necessarily have to disbelieve the testimony offered on Rubin's behalf.
 
 
 84
 Ostrer also claims that Connerton's testimony on Fosco's behalf prejudiced his defense. He argues that Connerton's reference to another insurance scheme run by a salesman in New York implicated Ostrer because he was the only defendant from New York. A review of the transcript shows, however, that Connerton never mentioned Ostrer by name, never stated that this New Yorker was also a defendant in this case, or otherwise suggested that one of the defendants in this scheme ran the prior scheme. Since there was nothing in Connerton's testimony to connect the prior scheme with the present scheme, much less with Ostrer specifically, Connerton's testimony was not in any way prejudicial to Ostrer's defense.
 
 
 85
 Ostrer also contends that he was entitled to a severance because he was denied adequate time to prepare his pro se defense. The Supreme Court has held that only an unreasoning and arbitrary insistence upon expeditiousness in the face of a justifiable request for a delay mandates reversal of a trial court's decision to deny a request for a continuance. Morris v. Slappy, 461 U.S. 1, 11-12, 103 S.Ct. 1610, 1616-17, 75 L.Ed.2d 610 (1983). Ostrer argues that the request for delay was justifiable because he was hospitalized for two months and because he had only twenty-four hours to confer with court-appointed stand-by counsel. The argument overlooks the fact that Ostrer had over a year from the date of the indictment to the first day of trial to prepare his defense and that he was represented by retained counsel for most of that period of time. Under these circumstances, we cannot conclude that Ostrer's request for a delay was justifiable, or that the district court's decision to go ahead and try Ostrer with the rest of the defendants was arbitrary.
 
 
 86
 Finally, Caporale and Wuagneux argue that the case was so lengthy and complex that the jurors were unable to keep straight which evidence went against which defendants. As a result, they argue, some evidence inculpating the other defendants necessarily prejudiced them. We reject this argument on two grounds. First, the jury demonstrated their ability to sift the evidence by acquitting three of the eleven defendants. We have held that convictions should be sustained where it may be inferred from the verdict that the jury meticulously sifted the evidence as to each defendant. United States v. Kabbaby, 672 F.2d 857, 862 (11th Cir.1982); United States v. Zicree, 605 F.2d 1381, 1389 (5th Cir.1979), cert. denied, 445 U.S. 966, 100 S.Ct. 1656, 64 L.Ed.2d 242 (1980). Second, since both defendants were being tried on a conspiracy charge, much of the evidence they object to as prejudicial would have been admissible against them in a separate trial to prove agreement and the predicate acts. Consequently, we conclude that the district court did not abuse its discretion in electing to try these eleven defendants together.
 
 E. Hearsay and Confrontation Clause
 
 87
 Caporale, Wuagneux, Giardiello, Rubin, Ostrer and Gopman, argue that portions of Milano, Jr.'s testimony were inadmissible hearsay and therefore improperly admitted into evidence. Specifically, they focus on Milano, Jr.'s testimony as to what Angelo Fosco and his father, Milano, Sr., told him about the kickback scheme. Milano, Jr., testified that Fosco told him that "he and Mr. Caporale got us the contract". Milano, Jr., also testified as to what his father told him about who received the DVCC payments.
 
 
 88
 Milano, Jr.'s testimony was properly admitted. Fosco's statements to Milano, Jr., are not hearsay because they are statements of a co-conspirator of a party during the course of and in furtherance of the conspiracy pursuant to Fed.R.Evid. 801(d)(2)(E).[28] See United States v. Cannington, 729 F.2d 702, 711 (11th Cir.1984); United States v. Peacock, 654 F.2d 339, 350 (5th Cir.1981), on reh'g, 686 F.2d 356, cert. denied, 464 U.S. 965, 104 S.Ct. 404, 78 L.Ed.2d 344 (1983). Milano, Sr.'s statements to Milano, Jr., are not hearsay under the same rationale. A statement made by a co-conspirator is admissible if evidence independent of hearsay statements shows that a conspiracy existed, that persons challenging admission were members of the conspiracy, and that the statements were made during the course of and in furtherance of the conspiracy. United States v. Cannington, supra, 729 F.2d at 711; United States v. Sanchez, 722 F.2d 1501, 1507 (11th Cir.), cert. denied, 467 U.S. 1208, 104 S.Ct. 2396, 81 L.Ed.2d 353 (1984). Non-hearsay evidence clearly established that Fosco, Milano, Sr., and Milano, Jr., were members of the conspiracy. Furthermore, Fosco's statements to Milano, Jr., were made to recruit his services in operating the kickback scheme, while Milano, Sr.'s statements to Milano, Jr., were made to assist Milano, Jr., in delivering kickback payments in the appropriate amounts to the appropriate parties. The trial court properly concluded that these statements were admissible pursuant to Rule 801(d)(2)(E) as statements made by co-conspirators in furtherance of the conspiracy.
 
 
 89
 Wuagneux, Giardiello, Rubin, Ostrer and Gopman also argue that the admission of Milano, Sr.'s statements via Milano, Jr., violates the Confrontation Clause of the United States Constitution. The Confrontation Clause is not transgressed if a statement that would otherwise be hearsay satisfies two requirements: 1) the declarant is unavailable, and 2) the statement bears adequate indicia of reliability, which may be inferred if the statement falls within a "firmly rooted hearsay exception." Ohio v. Roberts, 448 U.S. 56, 66, 100 S.Ct. 2531, 2539, 65 L.Ed.2d 597 (1980); Williams v. Melton, 733 F.2d 1492, 1496 (11th Cir.), cert. denied, 469 U.S. 1073, 105 S.Ct. 567, 83 L.Ed.2d 508 (1984); United States v. Peacock, supra, 654 F.2d at 349. Milano, Sr., was deceased at the time of the trial and therefore clearly unavailable. Furthermore, as discussed above, the statements bear adequate indicia of reliability as statements of a co-conspirator in furtherance of the conspiracy pursuant to 801(d)(2)(E). Although statements by a co-conspirator technically are not hearsay at all under Fed.R.Evid. 801(d)(2)(E), the courts have treated 801(d)(2) statements as if they were exceptions to the hearsay rule for purposes of analysis under the Confrontation Clause. United States v. Georgia Waste Systems, Inc., 731 F.2d 1580, 1581-82 (11th Cir.1984); United States v. Carter, 721 F.2d 1514, 1535 (11th Cir.), cert. denied, 469 U.S. 819, 105 S.Ct. 89, 83 L.Ed.2d 36 (1984); United States v. Peacock, supra, 654 F.2d at 349. The trial court did not err in admitting Milano, Sr.'s statements.
 
 F. Other Evidentiary Challenges
 
 90
 Wuagneux challenges the admission of two other pieces of evidence: 1) the joint venture agreements between Wuagneux's Sage Corporation and Gopman and 2) certain checks which he claims were not directly linked to Drake Towers. He argues that this evidence should have been excluded as irrelevant or extremely prejudicial because neither the checks nor the agreements had anything to do with transactions involving Drake Towers. His argument presupposes that the indictment narrowly charged him with laundering money through the Drake Towers project since the joint venture agreements and the checks clearly implicate Wuagneux in the conspiracy through dealings between other members of the conspiracy and Sage Corporation or with Wuagneux individually.
 
 
 91
 The indictment is not as narrow as Wuagneux asserts that it is, however. Paragraph 17 of the indictment charges Wuagneux with directing and maintaining both Drake Towers and the Sage Corporation as conduits for disguising illegal kickback payments. The joint venture agreements and checks show a continuing financial relationship between Gopman and Wuagneux as early as 1973 and, even more importantly, transfers of money during the transition from Fortune Services to Drake Towers as the kickback conduit. Such evidence is clearly relevant and was properly admitted into evidence.
 
 G. Prosecutorial Misconduct
 
 92
 Caporale, Ostrer, Giardiello, Rubin, and Gopman raise several challenges to the prosecutor's conduct at trial and during the course of the grand jury investigation. A prosecutor's comments must be viewed in the context of the record as a whole, and will be the basis for reversal only if they result in prejudice affecting the substantial rights of the defendant. United States v. Reme, 738 F.2d 1156, 1165-66 (11th Cir.1984), cert. denied, 471 U.S. 1104, 105 S.Ct. 2334, 85 L.Ed.2d 850 (1985); United States v. Tillman, 680 F.2d 1357, 1359 (11th Cir.1982).
 
 
 93
 Caporale claims prejudicial misconduct due to a question the prosecutor asked him during cross-examination. Caporale had testified on direct examination that he first met a certain C & A officer in 1970. On cross-examination, the prosecutor asked him about an application for a bank loan this C & A officer had made in 1969, in which the officer had represented that he previously had a contract with the Chicago Fund to provide dental services. Caporale told the prosecutor that he did not know anything about the C & A official's prior business dealings, and the prosecutor moved to another line of questioning.
 
 
 94
 We reject Caporale's claim that the prosecutor's question was either improper or prejudicial. The only arguably damaging inference that might be drawn from the question is that Caporale knew the C & A official one year earlier than he had testified. While such an inference might theoretically undercut Caporale's credibility, any real prejudice from the inconsistency is unlikely in view of Caporale's response to the question and the fact that the prosecutor did not attempt to impeach Caporale with the question or mention it in closing arguments.
 
 
 95
 Ostrer argues that the government improperly introduced evidence that he had laundered money because the indictment did not charge him with laundering money. Ostrer's argument, as with some of the other appellants' arguments, misreads the indictment. It charged that he ran SAEFA and Fringe Benefits "as, among other purposes, conduits for disguising illegal kickback monies received from DVCC" and that he and the other defendants had agreed to "hide and conceal, and cause to be hidden and concealed, the purpose of the conspiracy and the acts committed in furtherance of the conspiracy." While the indictment does not use the word "laundering", Ostrer's money laundering activity is clearly encompassed by the language of the indictment. Beyond that, evidence of money laundering activity would be admissible to establish a predicate act of racketeering for the RICO conspiracy charge, regardless of whether Ostrer was charged with some crime beyond conspiracy or not.
 
 
 96
 Ostrer, Giardiello, Rubin and Gopman also claim that the prosecutor improperly vouched for the credibility of Hauser and Milano, Jr., in his closing argument. This argument is meritless. The prosecutor merely told the jurors that Hauser and Milano, Jr., had no motive to lie since they had already been convicted, and that the jury had been shown every good reason why they should believe the witnesses. The prosecutor's comments are proper credibility arguments based on evidence in the record rather than personal vouching for the witness's credibility. Ostrer, Giardiello, Rubin and Gopman next argue that the government engaged in misconduct in presenting the case to the grand jury in several respects. First, they argue that the prosecutor improperly failed to inform the grand jury of Hauser's earlier perjury conviction. Since Hauser has never been convicted of perjury, however, the prosecutor could not have engaged in misconduct in this regard. They also claim that the grand jury was misled when Hauser testified before them that he had kept a diary of the events at issue in the case when in fact he had not. A conviction will be set aside for prosecutorial misconduct where the prosecution knowingly introduces false information and there is a reasonable likelihood that the false testimony prejudiced the defendant's rights. United States v. Butera, 677 F.2d 1376 (11th Cir.1982), cert. denied, 459 U.S. 1108, 103 S.Ct. 735, 74 L.Ed.2d 958 (1983); United States v. Rowan, 663 F.2d 1034, 1035 (11th Cir.1981). There is no indication that the prosecutors knowingly introduced Hauser's false testimony about the diary to the grand jury. Furthermore, there has been no showing that the false testimony contributed in any significant way to the grand jury's return of the indictment. We find no reversible error here.[29]
 
 
 97
 Finally, Ostrer, Giardiello, Rubin and Gopman argue that there was impermissible delay in returning the indictment against them. Although the scheme began in 1970, the indictment was not returned until 1981. Although the speedy trial guarantee of the Sixth Amendment does not apply to preindictment delay, dismissal for delay is warranted under the Fifth Amendment's Due Process Clause if the defendant shows 1) that the delay caused actual prejudice to the conduct of his defense and 2) that the government intentionally caused the delay in order to gain a tactical advantage over the defendant. United States v. Lovasco, 431 U.S. 783, 790, 97 S.Ct. 2044, 2048, 52 L.Ed.2d 752 (1977); United States v. Lindstrom, 698 F.2d 1154, 1157-58 (11th Cir.).
 
 
 98
 Even if Ostrer, Giardiello, Rubin and Gopman could prove prejudice from the delay, they clearly did not prove that the prosecution deliberately caused the delay to gain any tactical advantage. The delay in the return of the indictment is readily explained by the complexity of the case and the fact that the chief government witness, Hauser, did not begin to cooperate until 1979. Further, appellants have not suggested what tactical advantage the government hoped to gain in delaying the return of the indictment, or pointed to any tactical advantage that in fact resulted from the delay. It is plain that there has not been reversible prosecutorial misconduct in this case.[30]
 
 H. Jury Instructions
 
 99
 Gopman, Ostrer, Giardiello and Rubin object to three aspects of the district court's jury instructions.[31] To properly evaluate a challenge to a jury instruction, we must examine the entire charge as a whole to determine whether it is an accurate statement of the issues and the law. United States v. Bosby, 675 F.2d 1174, 1184 n. 17 (11th Cir.1982); United States v. Abravaya, 616 F.2d 250, 251 (5th Cir.1980). Where an appellant objects to the trial court's refusal to give an instruction, we will reverse only if the proposed instruction is an accurate statement of the law, is not covered in substantial part by the instructions given, and is so important that the defendant's ability to defend himself is seriously impaired by the denial. United States v. Williams, 728 F.2d 1402, 1404 (11th Cir.1984).
 
 
 100
 Gopman begins by arguing that the trial court erred in refusing to instruct the jury that the government bore the burden of proof on withdrawal from a conspiracy. He acknowledges that this Circuit has already ruled that the defendant bears the burden of proof on that issue, see United States v. Diaz, 662 F.2d 713, 717 (11th Cir.1981), but asks us to reconsider that ruling. We are bound by Diaz and see no reason to reconsider that ruling even if we were so empowered.
 
 
 101
 Second, Gopman, Giardiello, Rubin and Ostrer argue that the trial court's instructions on the requisite elements of a RICO offense failed to clearly instruct the jury that defendants could be found guilty only if the jury found that each defendant agreed to commit two predicate acts of racketeering. In particular, the contention focuses on a passage in the charge where the court explained that it was not necessary for the jury to find that any of the defendants actually committed the predicate acts. The three appellants contend that the jury could infer from this passage that any of the defendants could be convicted simply by agreeing to join a conspiracy where others had or planned to commit two such acts.
 
 
 102
 While this contention might have merit if the appellants had been indicted for and convicted of a substantive violation of RICO pursuant to 18 U.S.C.A. Sec. 1962(a)-(c), it overlooks the fact that the appellants were tried and convicted on a conspiracy charge, not a substantive charge. Although the evidence at trial clearly established substantive violations of the RICO statute, the appellants were charged with and convicted only of conspiracy to commit a substantive offense pursuant to 18 U.S.C.A. Sec. 1962(d). The crime of conspiracy under Section 1962(d) does not require that two predicate acts of racketeering actually occurred. United States v. Carter, 721 F.2d 1514 (11th Cir.1984). Instead, it requires that the defendants agreed to the commission of two predicate acts. Id.
 
 
 103
 The record in this case reflects that the trial judge's instructions fully conveyed to the jury that each defendant must have agreed to commit at least two predicate acts. The court read the language of the RICO statute to the jury and described in considerable detail the charge against the defendants. The court then charged:
 
 
 104
 In summary, four essential elements are required to be proved in order to establish the offense of conspiracy charged in the indictment:
 
 
 105
 First, that the conspiracy charged in the indictment was willfully formed, and was existing at or about the time alleged;
 
 
 106
 Second, that the accused willfully became a member of the conspiracy, that is, he objectively manifested, by his words or actions, an agreement to participate, directly or indirectly, in the conduct of the affairs of the enterprise, through a pattern of racketeering activity, as hereinafter defined, that is by agreeing to participate, directly or indirectly, in two or more acts of racketeering activity;
 
 
 107
 Third, that one of the conspirators thereafter knowingly committed at least one of the overt acts charged in the indictment, at or about the time and place alleged; and
 
 
 108
 Fourth, that such overt act was knowingly done in furtherance of some object or purpose of the conspiracy, as charged.
 
 
 109
 If the jury should find beyond a reasonable doubt from the evidence in the case, that the existence of the conspiracy charged in the indictment has been proved, and that during the existence of the conspiracy, one of the overt acts alleged was knowingly done by one of the conspirators in furtherance of some object or purpose of the conspiracy, then proof of the conspiracy offense charged is completed; and it is complete as to every person found by the jury to have been willfully a member of the conspiracy at the time the overt acts were committed, regardless of which of the conspirators did the overt act.
 
 
 110
 The object and purpose of the conspiracy charged in Count One, is the conduct of the affairs of an enterprise, in this case the Laborer's International Union of North America, through a pattern of racketeering activity.
 
 
 111
 The court's charge, when considered as a whole, fully informed the jury of the elements that the government was required to prove under 18 U.S.C.A. Sec. 1962(a), and the argument challenging the inadequacy of the charge is clearly without merit.
 
 
 112
 Ostrer contends that the district court's refusal to give his proposed instruction setting forth his theory of defense was improper. Ostrer's proposed instruction can be fairly characterized as a summary of his closing argument--a comment on the evidence rather than a statement of legal theory. Such an instruction cannot constitute an accurate statement of the law when it is not a statement of the law at all. In addition, the trial court's omission of the instruction cannot be said to have prejudiced Ostrer's defense when he admits that he was permitted to present his theory of defense at trial and argued the theory in his closing. The district court properly refused to give the tendered instruction.[32]
 
 I. Ex Post Facto
 
 113
 Caporale argues that his conviction violates the Ex Post Facto Clause of the Constitution because it could have been based solely on acts predating the enactment of RICO in October 1970. He argues that, since some of the overt acts alleged in the indictment occurred prior to the effective date of the enactment of RICO and the court failed to instruct the jury that it could convict him only if both predicate acts occurred after the effective date of the statute, the jury could have convicted him based on his conduct that predated the statute.
 
 
 114
 There is no Ex Post Facto violation here. In this case the trial judge's charge to the jury was clear that a defendant could not be convicted unless the jury found beyond a reasonable doubt from the evidence that a defendant continued to be a member of the conspiracy after June 3, 1976--a date several years after the RICO statute became effective in 1970.
 
 J. Gopman's Prior Plea Agreement
 
 115
 Appellant Gopman argues that his prosecution was barred because of a plea agreement he entered into in an earlier case. In 1978 Gopman pled guilty to various counts in an information and indictment of receiving kickbacks in violation of 18 U.S.C.A. Sec. 1954, income tax evasion in violation of 26 U.S.C.A. Sec. 7206(1), and embezzlement in violation of 18 U.S.C.A. Sec. 664. Some of the charges in the 1978 indictment and information were related to the events at issue in this prosecution. Gopman argues that his lawyer told him that the prior plea agreement embraced an understanding that the agreement disposed of all pending and future investigations of matters or charges related to the charges in that indictment and information. Since this prosecution arises in part from some of the charges in the 1978 prosecution, Gopman claims that the prosecution is barred.
 
 
 116
 The three-page plea agreement itself reflects that the government agreed to recommend a four-year prison term and a $25,000 fine in exchange for Gopman's pleas of guilty to the designated counts. The government also agreed to dismiss all the remaining counts of the indictment. The plea agreement does not mention anything about pending or future investigations or prosecutions. In addition, in ruling on Gopman's motion to dismiss based on the plea agreement, the district court made findings of fact that the plea agreement did not include any promises about any charges other than the ones involved in that particular indictment and information.[33] A district court's factual determination of the scope or content of a plea agreement may be set aside only if the finding is clearly erroneous. United States v. Quigley, 631 F.2d 415, 416 (5th Cir.1980).
 
 
 117
 Gopman has failed to establish that the district court's finding as to the scope of the agreement was clearly erroneous. The language of the document does not support Gopman's understanding of the agreement's scope, and he has offered nothing further to support his claim beyond his own understanding of the agreement as he claims it was explained to him by his attorney. It is well established in this Circuit that a defendant's belief as to the scope of the plea agreement does not control the scope of the agreement. United States v. Thomas, 593 F.2d 615, 623 (5th Cir.), on reh'g, 604 F.2d 450 (1979); cert. denied, 449 U.S. 841, 101 S.Ct. 120, 66 L.Ed.2d 48 (1980); Jones v. Estelle, 584 F.2d 687, 689 (5th Cir.1978); United States v. Bethany, 489 F.2d 91, 93 (5th Cir.1974). Furthermore, it is also well established that an attorney's misrepresentations to his client about the scope of an agreement are also not controlling. United States v. Flores, 616 F.2d 840, 842 (5th Cir.1980). We must therefore reject his argument.
 
 K. Double Jeopardy
 
 118
 Gopman and Wuagneux both contend that their prosecutions are barred by the constitutional prohibition against Double Jeopardy. The Double Jeopardy Clause of the Fifth Amendment forbids that "any person be subject for the same offense to be twice put in jeopardy of life or limb." U.S. Const. amend. V. Double jeopardy renders unconstitutional a second prosecution for the same crime after acquittal or conviction, and multiple punishments for the same crime. Albernaz v. United States, 450 U.S. 333, 101 S.Ct. 1137, 67 L.Ed.2d 275 (1981); United States v. Boldin, 772 F.2d 719, 725 (11th Cir.1985), mod. in part, 779 F.2d 618, cert. denied, --- U.S. ----, 106 S.Ct. 1269, 89 L.Ed.2d 577 (1986). In determining whether the Double Jeopardy Clause bars retrial, "the test to be applied to determine whether there are two offenses or only one, is whether each provision requires proof of an additional fact which the other does not." Blockburger v. United States, 284 U.S. 299, 304, 52 S.Ct. 180, 182, 76 L.Ed. 306 (1932).
 
 
 119
 Gopman argues that double jeopardy attached to his 1978 prosecution and subsequent plea agreement and thereby mandates dismissal of the indictment in this case. The indictment in the 1978 case alleged substantive violations of Sections 1962 and 1954. He argues that he may not now be prosecuted for RICO conspiracy because the predicate offenses in the present case include Section 1954 charges that overlap with two of the substantive Section 1954 charges in the 1978 case. The district court rejected Gopman's double jeopardy argument at the outset of the case, and Gopman took an interlocutory appeal. This Court affirmed the district court's holding that there was no double jeopardy under the test of Blockburger v. United States, supra, because a Section 1954 substantive offense did not constitute a lesser included offense of a RICO conspiracy offense.
 
 
 120
 Gopman makes the same argument here. While an interlocutory appeal on a double jeopardy claim is not binding on a later appeal, it will be reconsidered only upon an additional showing of jeopardy. United States v. Stricklin, 591 F.2d 1112, 1119 (5th Cir.), cert. denied, 444 U.S. 963, 100 S.Ct. 449, 62 L.Ed.2d 375 (1979). Gopman has not made any additional showing to justify a different result on this appeal. Sections 1954 and 1962 differ in that Section 1954 requires proof that the substantive offense was actually committed, while Section 1962 requires only proof that the defendant agreed to commit the substantive Section 1954 offenses in question. In addition, Section 1962 requires proof that the defendant agreed to participate in the affairs of an enterprise affecting interstate commerce, while Section 1954 does not. See United States v. Martino, 648 F.2d 367, 382-83 (5th Cir.1981), cert. denied, 456 U.S. 943, 102 S.Ct. 2006, 72 L.Ed.2d 465 (1982). We agree with the prior decision of this court that there is no double jeopardy here.
 
 
 121
 Wuagneux's double jeopardy claim is based upon an earlier RICO conviction involving a series of activities he carried on via his company, Sage Corporation. The earlier conviction involved the financing of several real estate projects and various scams involving pension funds, insurance companies, and two banks. See United States v. Wuagneux, 683 F.2d 1343 (11th Cir.1982), cert. denied, 464 U.S. 814, 104 S.Ct. 69, 78 L.Ed.2d 83 (1983). Wuagneux argues that double jeopardy bars this prosecution because the alleged misconduct in this case and the earlier case both occurred in the same time frame, involved Rubin and Gopman, and utilized the Sage Corporation as a vehicle.
 
 
 122
 The similarities in place, time and vehicle shared by the two convictions do not avoid the plain fact that the racketeering activity in the two cases was very different. The earlier case involved racketeering operated through the enterprise of the Sage Corporation rather than the Laborers International Union, and did not charge violations of either Section 1954 or 1962(d). Furthermore, the earlier case was not a kickback-insurance contract scheme but something altogether different. The fact that activities occurred at the same time and place using the same vehicles does not mean that only one crime is being committed. See United States v. Ruggiero, 754 F.2d 927, 931-32 (11th Cir.), cert. denied, 471 U.S. 1127, 105 S.Ct. 2661, 86 L.Ed.2d 277 (1985) (no double jeopardy where prior RICO conviction involves same enterprise if pattern of racketeering differs). There was no double jeopardy by Wuagneux's prosecution in this case.
 
 L. Improper Use of Immunized Testimony
 
 123
 Gopman claims that the government ran afoul of Kastigar v. United States, 406 U.S. 441, 92 S.Ct. 1653, 32 L.Ed.2d 212 (1972), by improperly using prior grand jury testimony he gave in 1978 under a grant of immunity. The government admits that the chief prosecutor in this case read the testimony prior to filing the indictment against Gopman. The district court ordered the government to produce all of its documents demonstrating its sources for the information in question, and then after the trial held a hearing on the issue. The district court then entered findings of fact that the government had met its burden of showing independent sources for each contested piece of information.
 
 
 124
 The Supreme Court held in Kastigar v. United States, supra, that the government bears the burden of proving that testimony that a defendant gave under a promise of use immunity was not directly or indirectly used in a subsequent prosecution against the defendant. To meet that burden, the government must show by a preponderance of the evidence that its evidence in the subsequent prosecution was derived from a legitimate independent source. Id. at 460, 92 S.Ct. at 1664; United States v. Byrd, 765 F.2d 1524, 1528-29 (11th Cir.1985); United States v. McDonnel, 550 F.2d 1010, 1012 (5th Cir.), cert. denied, 434 U.S. 835, 98 S.Ct. 123, 54 L.Ed.2d 96 (1977).
 
 
 125
 The essence of Gopman's argument is that the government can never establish an independent source when the prosecutor has read the immunized testimony prior to trial. The focus of the inquiry under Kastigar, however, is not whether the prosecutor was aware of the contents of the immunized testimony, but whether he used the testimony in any way to build a case against the defendant. Gopman has not come forward with any persuasive proof that the district court's determination as to any questioned source was clearly erroneous. Although he lists a number of facts that purportedly could have come only from his prior testimony, the district court made findings as to the independent source for each fact. Our review of the record confirms the district court's findings. Furthermore, it appears that Gopman's prior testimony was self-serving and of no real value in the subsequent investigation.[34] 4] There is no showing of a Kastigar violation.
 
 
 126
 AFFIRMED.
 
 
 
 *
 Honorable Walter E. Hoffman, Senior U.S. District Judge for the Eastern District of Virginia, sitting by designation
 
 
 [1]
 The total amount of kickbacks paid during the scheme's seven year operation was over two million dollars
 
 
 [2]
 Fosco was vice-president of the International Union and manager of the Chicago region. Although he was indicted as a defendant along with the other defendants-appellants, the jury acquitted him
 
 
 [3]
 Caporale was secretary-treasurer of the Chicago District Council of the Union and also a special representative to the International Union
 
 
 [4]
 Pilotto was the vice-president of the Chicago District Council of the Union, the president of the Union Local 5 in Chicago, and a special representative to the International Union
 
 
 [5]
 Fosco held his share surreptitiously
 
 
 [6]
 In addition to the cash payments, Fosco's son was made a vice-president of C & A
 
 
 [7]
 Tricario was an officer in the Union Local 767 in West Palm Beach and a trustee of the Local's Health and Welfare Benefit Fund
 
 
 [8]
 Giardiello was an officer of Union Local 767, and a trustee of the Florida Dental Plan
 
 
 [9]
 Rubin was president of Local 666 in Miami, business manager of Local 478, a trustee of three Union Health and Welfare Benefit Fund boards, president of the Southeast Florida District Council of the Union, and a representative to the International Union
 
 
 [10]
 Gopman was legal counsel to the Health and Welfare Benefits Fund in Florida and counsel to the Union locals and district council in southern Florida
 
 
 [11]
 Beyond the monthly 15% payments to the corporate conduits, Milano, Jr., made several cash payments to Rubin and Tricario between 1972 and 1977
 
 
 [12]
 Ostrer had previously written insurance policies for the Union and paid kickbacks to Union officials
 
 
 [13]
 The five severed defendants were Paul A. DiFranco, Paul Fosco (son of Angelo Fosco), James P. Norton, James Pinkard (Pilotto's son-in-law), and Santo Trafficante
 
 
 [14]
 The acquitted defendants were Angelo Fosco, Terence O'Sullivan, and Anthony Arcardo
 
 
 [15]
 In addition to advancing their own arguments, Giardiello, Rubin, Ostrer and Gopman adopt the arguments of all other appellants. Since some of the other appellants' arguments do not apply to some or all of these appellants, we will appropriately indicate throughout this opinion when any of these four appellants have joined in an argument by adoption
 
 
 [16]
 Appellants also make a meritless hypertechnical argument to the effect that the indictment improperly charged multiple enterprises rather than a single enterprise because it charged the International Union, its subordinated bodies, and its affiliated employee benefit plans
 
 
 [17]
 In a case where the evidence would support finding both a single conspiracy and multiple conspiracies, a defendant may be entitled to a jury instruction on multiple conspiracies. United States v. Sutherland, 656 F.2d 1181, 1189 n. 5 (5th Cir.1981), cert. denied, 455 U.S. 949, 102 S.Ct. 1451, 71 L.Ed.2d 663 (1982). A failure to give such an instruction is not reversible error, however, unless the defendant can show prejudice. Id
 
 
 [18]
 Compare Kotteakos v. United States, 328 U.S. 750, 66 S.Ct. 1239, 90 L.Ed. 1557 (1946) (variance held prejudicial where indictment charged one conspiracy but proof at trial showed eight conspiracies involving 32 defendants), with Berger v. United States, 295 U.S. 78, 55 S.Ct. 629, 79 L.Ed. 1314 (1935) (variance held non-prejudicial where indictment charged one conspiracy but proof at trial showed two conspiracies involving five defendants), and Jenkins, supra, 779 F.2d at 617 (variance held non-prejudicial where indictment charged one conspiracy but proof showed two conspiracies involving eight defendants)
 
 
 [19]
 See infra Part E discussing the admissibility of Milano, Jr.'s hearsay testimony
 
 
 [20]
 Wuagneux also advances a meritless claim that the government failed to prove the commission of two predicate acts as required by 18 U.S.C.A. Sec. 1962(d) because his use of Drake Towers as a conduit corporation amounted to a single act. The evidence at trial showed, however, that Drake Towers received 17 separate payments from DVCC over a 17 month period. Under the case law interpreting the predicate act requirement of RICO, each of these payments constitutes a separate violation of 18 U.S.C.A. Sec. 1954 and therefore a separate predicate act. See United States v. Colacurcio, 659 F.2d 684, 688 n. 4 (5th Cir.1981), cert. denied, 455 U.S. 1002, 102 S.Ct. 1635, 71 L.Ed.2d 869 (1982); accord, United States v. Boffa, 688 F.2d 919, 935-36 (3d Cir.1982), cert. denied, 460 U.S. 1022, 103 S.Ct. 1272, 75 L.Ed.2d 494 (1983)
 
 
 [21]
 Appellants argue that the comments of another juror, Jo Anne Allen, also establish a basis for a mistrial on grounds of bias. After eight of the defendants were convicted but before the remaining three defendants were acquitted during the jury's deliberations, two of the jurors sent a note to the judge asking "if one or more of the members of the jury is not fulfilling his or her duty according to the oath taken, can he be removed from jury duty? If not, then I wish to be removed as I do not feel that a fair and just verdict can be reached." The trial judge responded with an instruction to all jurors to go home and cool down and to come back the next day
 The testimony of various jurors at the evidentiary hearing indicates that the problem juror was not Curtice, but Jo Anne Allen, a black juror. The note was prompted by a statement apparently made by Allen that if the defendants in this case had been black, they would all be convicted, meaning that she felt that some of the jurors were giving the remaining three defendants a break because they were white. We cannot hold that this isolated statement made by a single juror establishes that the verdicts in this case were based on racial bias, particularly when the remaining three defendants were eventually acquitted, meaning that Allen herself eventually voted to acquit.
 
 
 [22]
 At oral argument, appellants contended that Heller stands for the proposition that ethnic jokes made in the jury room are per se basis for a mistrial. We do not read Heller as laying down a per se rule to that effect, but as establishing the proposition that a mistrial is warranted where it appears that ethnic bias on the part of the jury influenced the verdict, and that ethnic jokes can serve as a basis for finding ethnic bias
 
 
 [23]
 Giardiello and Rubin have not briefed this issue, but adopt the arguments of the other appellants
 
 
 [24]
 Caporale and Pilotto, neither of whom raises this issue, did request a jury trial should the court allow the government to proceed on a joint liability theory
 
 
 [25]
 Giardiello, Gopman and Rubin have adopted this argument
 
 
 [26]
 None of the appellants that challenge the joint and several imposition of liability contend that the imposition of such liability is outside the scope of penalties Congress is empowered to impose. However, Tricario, and, by "adoption," Giardiello, Gopman and Rubin do present an Eighth Amendment challenge to the imposition of such liability. Since this argument is raised for the first time on appeal, we decline to give it any consideration
 
 
 [27]
 In fact, criminal forfeiture itself, regardless of how applied, was largely unknown in the United States prior to the enactment of the RICO forfeiture provision. See United States v. Cauble, supra, 706 F.2d at 1345 (5th Cir.1983)
 
 
 [28]
 Caporale and, by "adoption," Giardiello, Rubin, Ostrer and Gopman, also argue that parts of Milano, Jr.'s testimony are inadmissible double hearsay. This claim is meritless. There is nothing to indicate that the statements of Milano, Sr., and Fosco to Milano, Jr., were based on anything other than personal knowledge
 
 
 [29]
 Ostrer also argues prosecutorial misconduct on the basis that Milano, Jr., and Hauser lied to the grand jury in various respects. Again, even if the testimony was indeed false, it does not constitute reversible error unless there is a showing that the government knowingly permitted the false testimony to come before the grand jury and that the false testimony is prejudicial. Ostrer has made no such showing
 
 
 [30]
 Ostrer's remaining arguments on the issue of prosecutorial misconduct are frivolous
 
 
 [31]
 Giardiello and Rubin adopt this argument as made by Gopman and Ostrer
 
 
 [32]
 Tricario also raises several objections to the trial court's handling of the jury during deliberations. These arguments are meritless and do not warrant further discussion
 
 
 [33]
 A careful review of the plea agreement ... reveals that it does not include any promise by the government related to offenses not charged in the Indictment and Information to which it relates. There is no suggestion of any oral or other written representations having been made to this defendant, and the written plea agreement is clear on its face
 
 
 [34]
 The chief government prosecutor went so far as to state that he believed that Gopman's earlier testimony was untruthful