[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

Nos. 10-14332; 10-14521; 10-15074
_____

D.C. Docket Nos. 1:09-cr-20673-DLG-10;
1:09-cr-20673-DLG-1;
1:09-cr-20673-DLG-30

UNITED STATES OF AMERICA,

Plaintiff–Appellee,

versus

BISHOP CAPERS,
LEON ANTHONY FREDERICK,
LARRY LITTLE,

Defendants–Appellants.

_____

Appeals from the United States District Court
for the Southern District of Florida
_____

(February 14, 2013)

Before TJOFLAT, MARTIN and FAY, Circuit Judges.

MARTIN, Circuit Judge:

Bishop Capers, Leon Anthony Frederick, and Larry Little appeal their convictions for conspiracy to possess with intent to distribute cocaine and crack cocaine in violation of 21 U.S.C. §§ 846 and 841(a)(1), possession with intent to distribute cocaine and crack cocaine in violation of 21 U.S.C. § 841(a)(1), and other counts.  Mr. Capers and Mr. Little also appeal their sentences.  After careful review, and with the benefit of oral argument, we affirm Mr. Frederick's convictions and sentence; we affirm Mr. Capers's convictions, and remand his case for resentencing under the Fair Sentencing Act (FSA); and we affirm Mr. Little's convictions, and remand his case for resentencing under the FSA.

## I.      BACKGROUND AND PROCEDURAL HISTORY

This case followed a two-year investigation into a cocaine trafficking organization operating out of the Coconut Grove neighborhood in Miami, Florida. The investigation resulted in a series of indictments charging as many as thirty defendants with various drug conspiracy and substantive offenses.  Of those originally indicted, many pleaded guilty and agreed to cooperate by testifying for the government.  Mr. Frederick, Mr. Capers, and Mr. Little went to trial on the forty-three count second superseding indictment.  That indictment charged each with conspiracy to possess with intent to distribute five kilograms of cocaine and fifty grams of crack cocaine (Count 1), and a number of counts of possession with

2

intent to distribute cocaine and crack cocaine.[1]  Mr. Frederick was also charged with possession of a firearm in furtherance of a drug trafficking crime in violation of 18 U.S.C. § 924(c)(1)(A)(ii) and 21 U.S.C. § 841(a)(1), (Count 42), and possession of a firearm by a convicted felon in violation of 18 U.S.C. § 922(g)(1), (Count 43).

Trial began on June 7, 2010.  The government presented evidence that Mr. Frederick was the leader of the Coconut Grove drug distribution operation.  From 2007 to 2009, Mr. Frederick and a partner, Ronald Burke,[2] operated out of a duplex at 3171/3173 Carter Street.  Mr. Burke testified that he sold small amounts of cocaine and crack to retail purchasers, and that Mr. Frederick sold quantities consistent with wholesale distribution.  Mr. Burke testified that together, he and Mr. Frederick sold approximately $1,500–7,000 of cocaine and crack cocaine from the Carter Street location each day.

Evidence collected from wiretaps of Mr. Burke's and Mr. Frederick's cell phones from January to March 2009 factored significantly in the government's case against Mr. Frederick.  Calls intercepted during these wiretaps included discussions between Mr. Frederick and Mr. Burke about police presence, whether

---

[1]  The defendants were also charged with aiding and abetting the possession and distribution of narcotics in each of the substantive counts of possession with intent to distribute, in violation of 18 U.S.C. § 2.

[2]  Mr. Burke, a co-defendant in the original indictment, pleaded guilty and testified for the government.

to shut down operations, and what to do with the drugs. They also included a number of conversations about specific drug transactions, with many requests by Mr. Burke for more drugs to supply their retail purchasers.

In support of the firearms offenses, the government introduced evidence that an AK-47 was recovered during a search of Mr. Frederick's condominium in Sunny Isles, Miami. The Sunny Isles search also turned up two kilograms of cocaine, empty baggies with cocaine residue, $47,000 cash, and documents bearing Mr. Frederick's name.

The evidence against Mr. Capers showed that he was one of Mr. Burke's regular customers, that he was addicted to crack cocaine, that he tended to purchase crack in .1 gram ("dime") units for $10 each, and that he usually purchased around ten dimes at a time. There was also testimony that Mr. Capers bought the dime amounts for $10 from Mr. Burke, and then resold ("juggled") them for $20 at locations outside Coconut Grove.

Regarding Mr. Little, several witnesses testified that he also juggled crack cocaine. The government also introduced evidence that its confidential informant (CI) purchased crack directly from Mr. Little and that Mr. Little shepherded customers—including the CI—to other drug dealers.

Mr. Frederick's theory of defense was primarily that the government lacked sufficient, credible evidence to convict him of the alleged charges. Mr. Capers and

4

Mr. Little each relied heavily on assertions that they were retail purchasers and end users of crack cocaine, "and therefore did not knowingly and willfully possess the drugs with the intent to distribute after they were obtained or knowingly and willfully conspir[e] with others to distribute after the drugs were obtained." Mr. Frederick, Mr. Capers, and Mr. Little did not testify at trial.

Following the ten-day trial, the jury deliberated for two days. On June 23, 2010, the jury returned its verdicts, convicting each defendant of most of the offenses charged. The jury convicted Mr. Frederick of the conspiracy charged in Count 1, all but one of the nineteen distribution counts as charged in Counts 10– 13, 16–24, 28, 30–31, 33, 39 and 41,[3] and the firearms violations alleged in Counts 42 and 43. The jury convicted Mr. Capers of a lesser included offense of the conspiracy charged in Count 1,[4] and four counts of possession with intent to distribute "detectable" amounts of crack cocaine as charged in Counts 16, 17, 18, and 20. Likewise, the jury convicted Mr. Little of a lesser included offense of the conspiracy charge,[5] and two counts of possession and distribution of five grams of crack as alleged in Counts 37 and 38.

---

[3] Count 39 alleged that Frederick possessed with intent to distribute fifty grams of crack; the jury convicted him of possession and distribution of only five grams of crack.

[4] Specifically, the jury found that Capers conspired to possess and distribute only five grams of crack, rather than "five kilograms of cocaine and 50 grams of crack cocaine" as charged.

[5] As with Mr. Capers, the jury found that Mr. Little conspired to possess and distribute only five grams of crack.

Mr. Capers was sentenced on September 1, 2010. At sentencing, he faced a guideline range of 360 months to life imprisonment based on a total offense level of 37 and a criminal history category of VI. However, having determined that Mr. Capers "was in the lower third of [defendants] in terms of culpability," "was a crack addict," and that "[m]ost of the drugs purchased were for [his] own use," the District Court imposed a below guidelines sentence of concurrent terms of 225 months imprisonment on Counts 1, 16–18, and 20. The District Court did not apply the August 3, 2010 Fair Sentencing Act to its calculation of Mr. Capers's guideline range. The District Court did, however, "consider[] the fact" that "under that new statute, [Mr. Capers's] guidelines would be 262–327 months."

Mr. Frederick was sentenced on September 8, 2010. He faced a guideline range of 444 months to life imprisonment based on application of the career offender enhancement, U.S.S.G. §§ 4B1.1(c)(2)(A) and 5G1.2(e). The District Court sentenced Mr. Frederick to concurrent terms of life imprisonment on Counts 1, 10, and 31; 360 months imprisonment on Counts 11–13, 16–24, 28, 30, 33, 39, and 41; and 120 months imprisonment on Count 43, with a consecutive term of 60 months on Count 42.

Mr. Little was sentenced on October 13, 2010. He faced a guideline range of the 360 months to life imprisonment based on a total offense level of 37 and a criminal history category of VI. Over Little's objection, the court did not apply the

6

FSA to the calculation of his guideline range, determining that the FSA was not retroactive to offenses committed before it was enacted.  However, due to the fact that Mr. Little's convictions involved quantities of drugs that totaled "less than one ounce," the court imposed a below-guideline sentence of concurrent terms of 327 months imprisonment on Counts 1, 37, and 38.

Mr. Capers, Mr. Frederick, and Mr. Little each filed timely notices of appeal.  Their appeals were then consolidated.

## II.    DISCUSSION

We consider each of the arguments raised by Mr. Frederick, Mr. Capers, and Mr. Little in turn.

### A.    GUILT PHASE

#### 1.    Mr. Frederick

Mr. Frederick raises five issues.  He argues that the District Court erred by: (1) denying his motion to suppress wiretap evidence; (2) denying his motion for judgment of acquittal for insufficient evidence; (3) denying his various motions for mistrial; and (4) denying his motion for a new trial.  Finally, he contends that cumulative error throughout the proceedings denied him a fair trial.

*a.    The District Court's Denial of Mr. Frederick's Motion to Suppress Wiretap Evidence*

The government's case against Mr. Frederick (and the others) was based in significant part on evidence derived from the wiretap.  Prior to trial, Mr. Frederick

moved "for entry of an Order suppressing wiretap evidence, [and] other evidence [derived from the wiretap] under the 'fruits of the poisonous tree' doctrine." As the basis for his motion, Mr. Frederick alleged that "[t]he Government's Affidavit in support of its Application to wiretap [his] cell phone contain[ed] . . . misleading statements made recklessly."

The District Court referred Mr. Frederick's motion to the Magistrate Judge, who recommended that the motion to suppress be denied because Frederick had not established that the wiretap affidavit would fail for want of probable cause absent the alleged "misleading statements." The District Court adopted the Magistrate Judge's report and recommendation without discussion and entered an order denying Mr. Frederick's motion to suppress.

Here, Mr. Frederick reasserts his claim that "the Wiretap Affidavit contained misrepresentations or omissions which required suppression of the wiretap evidence." Alternatively, Mr. Frederick argues that "at a minimum, [he] should have been afforded a full and fair . . . [evidentiary] hearing" on this issue, pursuant to Franks v. Delaware, 438 U.S. 154, 98 S. Ct. 2674 (1978).

"In reviewing a district court's ruling on a motion to suppress evidence, we review factual findings for clear error and the court's application of law to those facts de novo." United States v. Goddard, 312 F.3d 1360, 1362 (11th Cir. 2002). "The facts are construed in the light most favorable to the prevailing party." Id.

8

"[I]n reviewing a denial of a motion to suppress, we review the entire record, including trial testimony." United States v. Newsome, 475 F.3d 1221, 1224 (11th Cir. 2007). Franks v. Delaware provides, in pertinent part, that

> where the defendant makes a substantial preliminary showing that a false statement knowingly and intentionally, or with reckless disregard for the truth, was included by the affiant in the warrant affidavit, and if the allegedly false statement is necessary to the finding of probable cause, the Fourth Amendment requires that a hearing be held at the defendant's request. In the event that at that hearing the allegation of perjury or reckless disregard is established by the defendant by a preponderance of the evidence, and, with the affidavit's false material set to one side, the affidavit's remaining content is insufficient to establish probable cause, the search warrant must be voided and the fruits of the search excluded to the same extent as if probable cause was lacking on the face of the affidavit.

438 U.S. at 155–56, 98 S. Ct. at 2676 (emphasis added).[6]

Mr. Frederick argues that three paragraphs of the forty-page warrant affidavit contained "misleading statements," such that the wiretap evidence should have been suppressed. But Mr. Frederick has not explained how the purported misleading statements were "necessary to the finding of probable cause." Id. If probable cause still exists once the statements identified as misleading are extracted from the warrant, there is no need to conduct a hearing and no Franks violation. Id. at 171–72, 98 S. Ct. at 2684–85; see also United States v. Gamory, 635 F.3d 480, 492 (11th Cir. 2011). Because Mr. Frederick failed to do this analysis, he has abandoned any claim that

---

[6] The rule in Franks has since been held applicable to affidavits submitted in support of court-ordered electronic surveillance. E.g., United States v. Perez, 661 F.3d 568, 581 n.18 (11th Cir. 2011).

"the allegedly false statement[s] [were] necessary to the finding of probable

cause." Franks, 438 U.S. at 155–56, 98 S. Ct. at 2676.  He therefore cannot prevail

in his arguments that the District Court erred in failing to suppress this evidence,

and in failing to afford him a full evidentiary hearing on the issue.  See Holland v.

Gee, 677 F.3d 1047, 1066 (11th Cir. 2012) ("The law is by now well settled in this

Circuit that a legal claim or argument that has not been briefed before the court is

deemed abandoned and its merits will not be addressed."  (quotation marks and

alterations omitted)).

### b.    Sufficiency of the Evidence

At the close of the government's case-in-chief, Mr. Frederick moved for

judgment of acquittal pursuant to Federal Rule of Criminal Procedure 29.  The

District Court denied Mr. Frederick's motion.  Mr. Frederick argues here that this

ruling was error as to Counts 10–13, 16–20, 23, 28, 30, 31, 33, 39, and 41, and the

firearms offenses as alleged in Counts 42 and 43.[7]

We review de novo a District Court's denial of judgment of acquittal on

sufficiency of evidence grounds, considering the evidence in the light most

favorable to the Government, and drawing all reasonable inferences and credibility

choices in the Government's favor.  United States v. Friske, 640 F.3d 1288, 1290–

---

[7]  Mr. Frederick does not argue on appeal that the District Court erred in denying his Rule 29 motion as to Count 1 (conspiracy), or Counts 21, 22, and 23 (possession with intent to distribute cocaine).

10

91 (11th Cir. 2011). "A jury's verdict cannot be overturned if any reasonable construction of the evidence would have allowed the jury to find the defendant guilty beyond a reasonable doubt." United States v. Herrera, 931 F.2d 761, 762 (11th Cir. 1991). "The evidence need not be inconsistent with every reasonable hypothesis except guilt, and the jury is free to choose between or among the reasonable conclusions to be drawn from the evidence presented at trial." United States v. Poole, 878 F.2d 1389, 1391 (11th Cir. 1989). But "[w]hen the government relies on circumstantial evidence, reasonable inferences, not mere speculation, must support the conviction." United States v. Mendez, 528 F.3d 811, 814 (11th Cir. 2008).

We have little trouble rejecting Frederick's claim that there was insufficient evidence to convict him of the substantive drug counts in the indictment. To support a conviction under 21 U.S.C. § 841(a)(1), the government must show that the defendant had (1) knowing (2) possession of the drugs and (3) an intent to distribute them. See United States v. Cochran, 683 F.3d 1314, 1322 (11th Cir. 2012). The evidence at trial overwhelmingly demonstrated that Mr. Frederick and Mr. Burke operated a drug distribution network generating upwards of $1,500 revenue each day from the 3171/3173 duplex. Frederick was the "boss man" and was intimately involved in the day-to-day operations of the Coconut Grove drug ring. He was solely responsible for sales of the "big stuff," and shared

responsibility with Burke for distribution of the "small stuff." The jury heard testimony about this from several co-conspirators, and received a number of transcripts of phone conversations between Mr. Burke and Mr. Frederick detailing the specific drug transactions underlying the challenged counts. Viewing this evidence in the light most favorable to the government, it was not unreasonable for the jury to conclude that Mr. Frederick knowingly possessed the drugs charged in these counts, and intended to distribute them.

We also have little trouble rejecting Frederick's claim that there was insufficient evidence of possession to convict him of the drug and gun offenses resulting from the search of his Sunny Isles condominium, based on his argument that "there was no proof [he] ever exercised any dominion or control over the drugs and firearms at issue in those counts." It is well established that possession can be either actual or constructive, and that "'[c]onstructive possession' of a thing occurs if a person doesn't have actual possession of it, but has both the power and the intention to take control over it later." Cochran, 683 F.3d at 1316 (quoting 11th Cir. Pattern Jury Instructions (Criminal), Special Instruction 6 (2010)). Here, the jury received evidence that in addition to drugs and the gun, Drug Enforcement Agency (DEA) agents recovered several pieces of Mr. Frederick's identification, and mail sent to him at the condominium. This evidence was sufficient for the jury

to reasonably determine that Frederick possessed "both the power and intention to take control" of the drugs and gun recovered in the condominium.  Id.

### c.    The District Court's Denial of Mr. Frederick's Motions for Mistrial

In the course of his trial, Mr. Frederick filed three written motions for mistrial alleging a number of discovery violations, Jencks Act violations, Giglio violations, Rule 404(b) violations, and a failure to correct misleading testimony. The government responded to the allegations in Mr. Frederick's motions and the District Court denied relief on all grounds.  On appeal, Mr. Frederick argues that the District Court erred in failing to grant his motions for mistrial.

We review a District Court's decision not to grant a mistrial for abuse of discretion.  United States v. Emmanuel, 565 F.3d 1324, 1334 (11th Cir. 2009).  "A mistrial should be granted if the defendant's substantial rights are prejudicially affected.  This occurs when there is a reasonable probability that, but for the [alleged error], the outcome of the trial would have been different."  United States v. Newsome, 475 F.3d 1221, 1227 (11th Cir. 2007) (quotation marks omitted). "[W]hen the record contains sufficient independent evidence of guilt, any error was harmless."  Id.

Mr. Frederick's claim that the District Court abused its discretion in denying his motions for mistrial does not prevail.  First, any failure by the government to comply with the requirements of the Standing Discovery Order was rendered

13

harmless by the substantial independent evidence of Mr. Frederick's guilt. Second, Mr. Frederick's claim that the government failed to comply with the Jencks Act, 18 U.S.C. § 3500, is not persuasive because the material the government failed to turn over—specifically, the 1999 federal grand jury testimony of government's witness Donald Grant related to the murder of Grant's sister—was not related in any way to the subject matter of Grant's testimony in this trial. See id. § 3500(b) (requiring the government, upon motion of the defendant, to "produce any statement . . . of the [government's] witness in the possession of the United States which relates to the subject matter as to which the witness has testified." (emphasis added)). Third, Mr. Frederick offers nothing to rebut the government's statement to the District Court that it had fully complied with its obligations under Giglio v. United States, 405 U.S. 150, 92 S. Ct. 763 (1972), so we would be hard-pressed to say that the District Court abused its discretion by relying on those representations as true. Fourth, the Federal Rule of Evidence 404(b) violations alleged by Mr. Frederick involved criminal activities inextricably intertwined with the criminal conspiracy and therefore not governed by the requirements for admission of evidence under Rule 404(b). See United States v. Foster, 889 F.2d 1049, 1054–55 (11th Cir. 1989) (holding that evidence of specific uncharged drug trafficking offenses were not extrinsic to prosecution for conspiracy to possess and distribute cocaine where the events occurred within the time period of the alleged conspiracy and were

14

demonstrative of the conspirators' conduct).  Finally, Mr. Frederick impeached the government's witness on precisely the misleading testimony that he now claims the government failed to correct.  In sum, the district court did not abuse its discretion in denying Mr. Frederick's various motions for mistrial.

### d.    The District Court's Denial of Mr. Frederick's Motion for New Trial

After the jury returned its verdict, Mr. Frederick filed a Motion for New Trial pursuant to Federal Rule of Criminal Procedure 33.  In support of that motion, Mr. Frederick incorporated the same grounds that he alleged in his three written motions for mistrial, discussed above.  The government opposed in writing.  Although there is no docket entry, we gather that the District Court denied this motion.  Mr. Frederick appeals this denial.

We review the District Court's denial of a motion for a new trial for abuse of discretion.  United States v. Hernandez, 433 F.3d 1328, 1332 (11th Cir. 2005).  We have already concluded that the District Court did not abuse its discretion in denying Mr. Frederick's motions for mistrial on these grounds.  For those same reasons, it also did not abuse its discretion in denying Mr. Frederick's motion for new trial on these grounds.

15

*e.     Cumulative Error*

Finally, Mr. Frederick contends that "cumulative error warrant[s] reversal of his convictions." Specifically, he draws our attention to "the Judge's failure to grant a mistrial" and "additional errors involv[ing] evidentiary rulings."

"The cumulative error doctrine provides that an aggregation of non-reversible errors (i.e., plain errors failing to necessitate reversal and harmless errors) can yield a denial of the constitutional right to a fair trial, which calls for reversal." United States v. Baker, 432 F.3d 1189, 1223 (11th Cir. 2005) (quotation marks omitted). "The harmlessness of cumulative error is determined by conducting the same inquiry as for individual error—courts look to see whether the defendant's substantial rights were affected." Id. (quotation marks omitted).

Mr. Frederick cannot prevail on his claim that cumulative error deprived him of a fair trial. First, for reasons explained, the District Court committed no error, plain or otherwise, in denying his various motions for mistrial. Second, even if we assume without deciding that the various evidentiary rulings Mr. Frederick complains of were erroneous, he has failed to demonstrate, or offer any explanation, for how the aggregate effect of these errors substantially influenced the outcome of his trial, as required to establish that cumulative error rendered his trial unfair. See id. at 1223–24. Thus, Mr. Frederick's cumulative error argument fails.

16

2.    Mr. Capers

Mr. Capers argues that the evidence presented against him was legally insufficient to establish he was part of the conspiracy, or to sustain his convictions for possession with intent to distribute crack as alleged in the substantive counts. He also argues that the District Court abused its discretion when it denied his motion for a new trial.

*a.    Sufficiency of the Evidence*

At the end of the government's case-in-chief, Mr. Capers moved for a Rule 29 Judgment of Acquittal.  The District Court denied the motion.

i.    Evidence Supporting the Conspiracy Conviction

Mr. Capers was convicted of conspiracy to distribute cocaine and crack cocaine in violation of 21 U.S.C. §§ 846 and 841(a)(1).  To be convicted of conspiracy to distribute narcotics, "the Government must establish beyond a reasonable doubt: 1) the existence of an agreement among two or more persons; 2) that the defendant knew of the general purpose of the agreement; and 3) that the defendant knowingly and voluntarily participated in the agreement." United States v. Simpson, 228 F.3d 1294, 1298 (11th Cir. 2000).

Mr. Capers's theory of defense was that he was a retail purchaser of crack cocaine and therefore did not knowingly and willfully conspire to possess and distribute the drugs he purchased from different people in Coconut Grove.

17

Consistent with his theory at trial, Mr. Capers argues here that the "[t]he testimony of the[] accomplice witnesses did not establish [his] involvement in the distribution of the crack cocaine he bought" because "[e]ven if credence is given to the Government's contention that he resold the cocaine elsewhere, that inference did not make him part of the conspiracy." Essentially, Mr. Capers argues that his conspiracy conviction must be overturned because the government failed to prove that "[he] was part of the distribution chain flowing from Frederick through Burke."

In evaluating Mr. Capers's argument, we have concluded that even if we credit his assertions that the drugs purchased directly from Ronald Burke were entirely for personal use, there remains substantial evidence that he was aware of and knew the general purpose of the drug ring headed by Mr. Frederick and Mr. Burke, and that he was a knowing and voluntary participant in the objectives of that ring. See Simpson, 228 F.3d at 1298. The jury heard testimony to the effect that Mr. Capers regularly made purchases of crack and cocaine in amounts consistent with redistribution. Included in the wiretap evidence were two conversations between Mr. Capers and Mr. Burke about the possibility of purchasing distribution level amounts of cocaine and crack. Specifically, Mr. Capers asked about purchasing a $50–75 bag of powder cocaine and about purchasing an "eight-ball" (3.4 grams) of crack. On each occasion, Mr. Burke

18

referred Mr. Capers to Mr. Frederick.  There was no evidence that Mr. Capers completed either of these particular purchases, but the jury heard from a number of witnesses that he dealt directly with Mr. Frederick as often as three to four times per week.  Jimmy Tucker, another cooperating witness, testified that Mr. Capers was familiar with Mr. Frederick's price for wholesale amounts of powder cocaine, and that he was frustrated that the price had risen from $800 to $900/ounce.  Mr. Tucker also testified that Mr. Capers's drug dealing activity was at a level above that of a "petty juggler"; the implication being that Mr. Capers purchased larger amounts of crack for redistribution, similar to Mr. Tucker.  Finally, the jury heard evidence of conversations between Mr. Capers and Mr. Burke in which Capers warned Burke about police activity in the area around Coconut Grove, indicating Capers's interest in the continued operation of the drug ring.

Based on this evidence, it was not unreasonable for the jury to determine that Mr. Capers knew of the existence of an agreement between Mr. Burke and Mr. Frederick to distribute drugs in Coconut Grove; that he knew of the general purpose of the agreement; and that he knowingly and voluntarily participated in the objectives of that agreement.  See Simpson, 228 F.3d at 1298.  This being the case,

19

the District Court did not abuse its discretion when it denied his motion for judgment of acquittal on the conspiracy count.[8]

> ii. Evidence Supporting the Possession with Intent to Distribute Convictions

Mr. Capers was also convicted of four counts of possession with intent to distribute "detectable" amounts of crack in violation of 21 U.S.C. §§ 841(a)(1) and (b)(1)(C), as alleged in Counts 16, 17, 18, and 20.  As we have set out above, in order to prove that a defendant possessed narcotics with an intent to distribute, the government must show that the defendant had knowing possession of the drugs and intent to distribute them.  Cochran, 683 F.3d at 1322.

Each of Mr. Capers's possession and distribution convictions involved purchases of crack from Ronald Burke.  Mr. Capers argues that the evidence was not sufficient to sustain these convictions because (1) "the government failed to prove the . . . offenses occurred on [the dates alleged]" insofar as it established only that he was invited to go to Burke's apartment to purchase crack cocaine, not

---

[8]  Mr. Capers suggests that the juggling he engaged in was limited to the "common practice" by drug addicts of "buy[ing] a 'dime', and cut[ting] it into two 'nickels' . . . then consum[ing] one and sell[ing] the other." Mr. Capers argues that such petty juggling, intended merely to finance a drug users' habit, is insufficient "[a]s a matter of law . . . [to] make him a member of the conspiracy."  We need not decide whether this type of juggling alone would be insufficient as a matter of law to sustain a conspiracy conviction, however, because the evidence at trial was sufficient for a jury to conclude that Mr. Capers operated at a level above that of a "petty juggl[er]."  Jimmy Tucker testified to the effect that Mr. Capers regularly purchased large amounts of crack from Mr. Frederick, and that he broke those larger units down for resale outside the Grove which, Mr. Capers concedes, is enough to prove involvement in a conspiracy to distribute narcotics.

that he did; and (2) he purchased crack cocaine in unit sizes "consistent [only] with personal use and not consistent with redistribution." In other words, Mr. Capers contends that the government failed to prove that he possessed the drugs in question and, in any event, failed to prove he had the intent to distribute the drugs he did possess.

### 1)    Proof of Possession

"[Possession] can be proven by either direct or circumstantial evidence." United States v. Poole, 878 F.2d 1389, 1391–92 (11th Cir. 1989). The government never got drugs directly from Capers. Instead, as proof that Capers possessed the "detectable" amounts of crack at issue in Counts 16, 17, 18, and 20 it offered circumstantial evidence, consisting of recordings of phone conversations between Mr. Burke and Mr. Capers arranging for purchases of crack cocaine on the dates charged, as well as Burke's testimony that he completed these transactions with Capers on those dates. Viewed in the light most favorable to the government, a jury could reasonably conclude that Capers possessed the drugs at issue in these counts.

### 2)    Proof of Intent to Distribute

The intent to distribute element of § 841(a)(1) can also be proved through circumstantial evidence. Poole, 878 F.2d at 1391–92. "Intent to distribute can be proven circumstantially from, among other things, the quantity of cocaine and the

21

existence of implements such as scales commonly used in connection with the distribution of cocaine." Id. at 1392.

As stated, the government did not recover narcotics of any amount from Mr. Capers. Neither did it recover any illicit implements. Instead, as circumstantial proof that Mr. Capers intended to redistribute the drugs that he purchased from Mr. Burke, the government relies on "testimony from co-conspirators regarding Capers' juggling activities."

As stated, Mr. Capers purchased the drugs underlying Counts 16, 17, 18 and 20 from Ronald Burke. Mr. Burke testified that Capers was a "friend" and a "customer," "mostly a [crack] smoker," and a "drug addict." Mr. Burke also testified that he did not know what Mr. Capers did with the crack once he sold it to him, but that "[a]s far as [he was] concerned," Capers smoked it. Without more, there would have been little basis to conclude that Mr. Capers intended to distribute the drugs that he purchased from Mr. Burke.

But the jury also heard testimony from two other co-conspirators—Jimmy Tucker and Otis Walker—that Mr. Capers resold the crack he purchased in Coconut Grove. The jury received evidence that Mr. Burke tended to sell Mr. Capers ten or eleven dime bags of crack at a time, and that Burke sold these quantities to Capers on the dates alleged in Counts 16, 17, 18, and 20. Based on this evidence, and viewed in the light most favorable to the government, the jury

could reasonably infer that Mr. Capers intended to redistribute at least some of the crack he purchased from Mr. Burke.  Therefore, Mr. Capers's convictions for counts 16, 17, 18, and 20 are affirmed.

### b.    Motion for New Trial

Following the jury's verdict, Mr. Capers filed a timely motion for a new trial pursuant to Rule 33.  The District court denied the motion.  On appeal, Mr. Capers argues this was an abuse of discretion because there was insufficient evidence to support his conspiracy conviction; it was "manifest injustice" for the government to base its conspiracy case against him on his juggling activities; and it was prosecutorial misconduct for the assistant United States attorney (AUSA) to comment on Mr. Capers's juggling in her closing argument.

Our examination leads us to conclude that the evidence was sufficient to sustain Mr. Capers's conspiracy conviction.  Further, there is simply no authority for Mr. Capers's claim that it was "manifest injustice" for the government to prosecute him for conspiracy on a theory that he juggled cocaine where, as here, witnesses testified that Mr. Capers purchased distribution-level amounts of crack from Mr. Frederick and sold it for higher prices in other locations.  Finally, insofar as Jimmy Tucker and Otis Walker each testified to the effect that Mr. Capers operated at a level above that of a "petty juggl[er]," it was permissible for the

23

AUSA to argue in closing that he engaged in such behavior.  In sum, the district court did not abuse its discretion in denying Mr. Capers's motion for a new trial.

### 3.    Mr. Little

Mr. Little also raises a number of issues on appeal.  He argues that his convictions should be reversed because: (1) the District Court quashed his subpoena seeking production of his interview with police; (2) the District Court erroneously admitted certain evidence and, in any event, the evidence was insufficient to sustain his conviction; (3) the AUSA's closing argument was so inflammatory as to require reversal; and (4) cumulative error denied him a fair trial.

### a.    The Quashed Subpoena

The government's investigation into the Coconut Grove drug ring involved the cooperation of CIs.  In September 2008, one of the CIs was killed.  Miami police took the lead in investigating the homicide, and at one point interviewed Mr. Little in connection with the case.

Based on information obtained from the government through pre-trial discovery, Mr. Little anticipated that the homicide would factor into this case. Thus, in October 2008, Mr. Little sought production of information related to the Miami Police Department's investigation.  Specifically, Mr. Little wanted a copy of the recording of his police interview.  Mr. Little believed that The First 48, a

reality TV show, possessed a copy and requested a subpoena be served on its producers—A & E Television Networks, LLC (AETN) and ITV Studios, Inc. (ITV)—pursuant to Federal Rule of Criminal Procedure 17.  The subpoena requested production of "[a]ll photographs, video and/or audio recordings of interviews of [thirty named individuals including Larry Little], made in connection with the filming of The First 48, in relation to the homicide investigation concerning [the CI]."

The District Court granted Mr. Little's request in part, ordering that the subpoena be issued, but that all documents and materials be "receive[d] [by the court] and review[ed] . . . in camera to make a determination that production of the materials to [Little] is appropriate under Federal Rule of Criminal Procedure 17(c)."  Upon receipt of the subpoena, AETN and ITV filed a motion to quash, acknowledging that they had a tape of Mr. Little's interview, but asserting that they were shielded from having to produce the tape by the qualified journalists' privilege.  The District Court granted this motion, holding that Mr. Little had failed to make the required showing to overcome the qualified journalists' privilege.  On appeal, Mr. Little argues that this was an abuse of discretion because he "met the test articulated by the Eleventh Circuit to overcome [the] . . . privilege."  In the alternative, he suggests that application of the qualified journalists' privilege in this instance violated his right to compulsory due process.

We review a District Court's decision to quash a Rule 17 subpoena for abuse of discretion. See United States v. Silverman, 745 F.2d 1386, 1397 (11th Cir. 1984). Our Circuit recognizes a qualified privilege for journalists, allowing them to resist compelled disclosure of their professional news gathering efforts. This privilege shields reporters in both criminal and civil proceedings. United States v. Caporale, 806 F.2d 1487, 1504 (11th Cir. 1986) (applying privilege in criminal racketeering trial); Miller v. Transamerican Press, Inc., 621 F.2d 721, 726 (5th Cir. 1980), cert. denied, 450 U.S. 1041, 101 S. Ct. 1759 (1981) (applying privilege in civil libel suit).[9] In granting AETN's and ITV's motion to quash Mr. Little's Rule 17 subpoena, the District Court applied the test articulated in Caporale, where we said "that information may only be compelled from a reporter claiming privilege if the party requesting the information can show that it is highly relevant, necessary to the proper presentation of the case, and unavailable from other sources." 806 F.2d at 1504.

The District Court determined that Mr. Little did not make the evidentiary showing necessary to overcome the privilege because (1) the recorded interrogation sought was not "highly relevant" to Mr. Little's case to the extent that he was charged with "offenses relating to a drug conspiracy, not a homicide" and "the drug transactions occurred nearly a year after the homicide"; and (2) Mr.

---

[9] In Bonner v. City of Prichard, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc), we adopted as binding precedent all decisions of the former Fifth Circuit handed down before October 1, 1981.

Little "failed to establish that he [could] not obtain the information from other sources, such as the police who conducted the interviews." The court did not address whether the recordings were "necessary to the proper presentation of [Mr. Little's] case." Caporale, 806 F.2d at 1504. On appeal, Mr. Little contests each of the District Court's findings.

Even if we credit Mr. Little's argument that the District Court erred in determining that the interrogation video was not highly relevant to his defense, his claim still fails because he has not established that the materials were unavailable from another source. For reasons unknown to us, Mr. Little never attempted to get the interview from the agency that conducted it—the Miami Police Department— until August 18, 2010, almost two months after his trial was over. Miami police maintained a copy of the interview, and the record indicates that the District Court stood willing to enforce a subpoena against the Police Department. Thus, because Mr. Little failed to demonstrate that the interview was otherwise "unavailable from other sources," the District Court did not abuse its discretion in quashing his motion to compel from AETN and ITV.

Mr. Little's alternative argument—that his convictions should be overturned because the test articulated in Caporale is not consistent with the Sixth Amendment's "right to compulsory process"—is equally unpersuasive. The Sixth Amendment guarantees that a criminal defendant shall "have compulsory process

27

for obtaining witnesses in his favor." U.S. Const. amend. VI. But before there can be a violation of the right to compulsory process, a criminal defendant must "establish some colorable need" for the evidence to be compelled. Cf. Hoskins v. Wainwright, 440 F.2d 69 (5th Cir. 1971) ("The right to compulsory process is not absolute, and a state may require that a defendant requesting such process at state expense establish some colorable need for the person to be summoned, lest the right be abused by those who would make frivolous requests."). Mr. Little never requested that the District Court subpoena the interview from the Miami Police Department. That being the case, Mr. Little cannot "establish some colorable need" for why he required that the interview be obtained from AETN and ITV, rather than the Miami Police Department. See id.

### b.    Evidentiary Issues

Mr. Little points to a number of evidentiary issues that he claims require reversal of his convictions. Because the effect of certain purported errors is compounding, we consider errors associated with each offense of conviction in turn.

### i.    Count 1, Conspiracy

At the conclusion of the government's case-in-chief, Mr. Little moved for judgment of acquittal on his conspiracy charge. The District Court denied his motion. Mr. Little argues that this was error because there was insufficient

28

evidence to sustain his conspiracy conviction.  He also contends that his conspiracy conviction should be reversed because the District Court abused its discretion in denying his motion for mistrial based on the admission of impermissible Rule 404(b) evidence.

At trial, Mr. Little advanced the same theory of defense as Mr. Capers, specifically that he was a user of crack cocaine and "therefore did not knowingly and willfully possess the drugs with the intent to distribute after they were obtained or knowingly and willfully conspire[] with others to distribute after the drugs were obtained."  In the light most favorable to the government, however, the evidence was sufficient to convict Mr. Little of conspiracy for the same reasons that it was sufficient to convict Mr. Capers.  Like Mr. Capers, Mr. Little engaged in more than just "petty juggling."  Four co-conspirators independently testified that Mr. Little purchased significant amounts of crack in Coconut Grove and resold it to outsiders. Continuing this theme, Jimmy Tucker testified that he fronted drugs to Mr. Little, and that Little paid him back with the profits he earned by reselling them.  Also, co-conspirator George Merrill testified that Mr. Little brought him customers, including the CI, on at least fifteen occasions during the time period of the conspiracy.  Drawing all reasonable inferences in favor of the jury's verdict, it was reasonable for the jury to infer from this evidence that Mr. Little was aware of the

conspiracy and its object, and that he knowingly and voluntarily participated in it.

Therefore, sufficient evidence existed to sustain his conviction for Count 1.

Likewise we reject Mr. Little's Rule 404(b) argument as to his conspiracy conviction. Although the District Court admitted testimony from cooperating witnesses that Mr. Little engaged in a number of drug transactions between 2007 and 2009 that did not result in substantive charges, we have already explained that Rule 404(b) only applies to "extrinsic evidence." See Edouard, 485 F.3d at 1343. Each of the "violation[s]" alleged by Mr. Little involved testimony about uncharged criminal conduct relating to the distribution of drugs during the time period of the alleged conspiracy. This evidence was not "extrinsic" to Mr. Little's case, and therefore not subject to the same requirements for admission as Rule 404(b) evidence. Id. Therefore, the District Court did not abuse its discretion in denying his motion for mistrial.[10]

ii.    Counts 37 and 38, Possession with Intent to Distribute Crack on July 28 and August 3, 2009

Mr. Little was convicted of two counts of possessing with intent to distribute five grams of crack cocaine (Counts 37 and 38). For each of those counts, he argues that the District Court erroneously admitted certain exhibits, and that

---

[10] Mr. Little also suggests that his "right to due process" was violated when the District Court admitted evidence of these uncharged transactions. However, Mr. Little failed to brief this argument, or to offer any explanation at all as to why this would be the case. Thus, we will not consider this undeveloped claim here. See Holland, 677 F.3d at 1066.

30

without these exhibits, the evidence was not sufficient to prove that he committed the offenses alleged.

> 1)    Count 37, Possession with Intent to Distribute Crack on July 28, 2009

For Count 37, the government offered as evidence video and audio recordings of Mr. Little shepherding the CI to Otis Walker's house, where the CI purchased drugs from Walker.  Over Mr. Little's objection that the government had failed to establish that the recording devices were in proper working order, the District Court received these exhibits into evidence.  Mr. Little points to this as error.

"We review the district court's admission of evidence for abuse of discretion."  United States v. Trujillo, 146 F.3d 838, 843 (11th Cir. 1998).  "Even where an abuse of discretion is shown, non-constitutional evidentiary errors are not grounds for reversal absent a reasonable likelihood that the defendant's substantial rights were affected."  United States v. Range, 94 F.3d 614, 620 (11th Cir. 1996) (quotation marks omitted).

Generally, "the trial judge has broad discretion in determining whether to allow a recording to be played before the jury."  United States v. Biggins, 551 F.2d 64, 66 (5th Cir. 1977).  Still, "the party introducing a tape into evidence has the burden of going forward with sufficient evidence to show that the recording is an

accurate reproduction of the conversation recorded." United States v. Sarro, 742

F.2d 1286, 1292 (11th Cir. 1984).

> In order to authenticate a taped recording, the government, in a criminal case, must show: (1) the competency of the operator; (2) the fidelity of the recording equipment; (3) the absence of material deletions, additions, or alterations in the relevant part of the tape; and (4) the identification of the relevant speakers.

Id. "If there is independent evidence of the accuracy of the tape recordings admitted at trial, we shall be extremely reluctant to disturb the trial court's decision even though at the time that decision was made the government had not carried its particularized burden of going forward." Biggins, 551 F.2d at 67.

The district court did not abuse its discretion in admitting the July 28 recording. Mr. Little's argument that the government failed to produce evidence of the "the fidelity of the recording equipment" is contradicted by the record. DEA Agent Vattiato testified that he supplied the CI with audio-only and audio/video equipment on July 28 and that the audio/video equipment was operating correctly. Although Vattiato did not testify that the audio-only equipment was also operating correctly, he did testify that he had the opportunity to watch the audio/video recording, that the events in that recording were "encompassed" in the audio-only recording, and that each recording "match[ed] the surveillance that [he] observed that day." From this testimony the District Court could infer that the audio-only equipment was also working properly.

32

Although the District Court did not abuse its discretion in admitting the audio and video recordings of the July 28 transaction, we must still consider whether it abused its discretion by denying Mr. Little's motion for judgment of acquittal for lack of sufficient evidence.  Friske, 640 F.3d at 1290–91.

Mr. Little argues that there was insufficient evidence to convict him of possession with intent to distribute crack on July 28 because the government failed to prove the element of possession.  Specifically, he contends that the government cannot prove actual possession because "the cocaine was beyond [his] control" at all times during the transaction, and the government cannot prove constructive possession because he was forced to wait outside while the CI purchased the drugs inside Otis Walker's house, and the drugs were "clearly not under [his] direction or control."

We agree with Mr. Little that, on this record, the government failed to prove the element of possession.  It is clear from the video that the CI purchased the drugs directly from Otis Walker and, thus, that they were never in Mr. Little's actual possession.  It is equally clear that Mr. Little was forced to wait on Otis Walker's porch as Walker conducted the transaction with the CI inside.[11]  To prove constructive possession, "the government must produce evidence showing

---

[11]  The government concedes that "Little was not allowed in Walker's house" during the drug deal.  Otis Walker emphasized this point in his testimony at trial when he explained that he forced Mr. Little to wait on the porch "[b]ecause he didn't come to spend no money."

33

ownership, dominion, or control over the contraband itself or the [location] in which contraband is concealed." Wright, 392 F.3d at 1273 (quotation marks and alterations omitted). Walker's demand that Mr. Little stay outside, and Little's acquiescence to that demand, defeats any claim that Little exercised ownership, dominion, or control over these drugs, or the location where they were concealed. Cf. United States v. Clavis, 956 F.2d 1079, 1089 (11th Cir. 1992) (holding that evidence was insufficient to prove constructive possession where the defendant was in jail at the time the drugs were seized from his residence).

The government's failure to prove that Mr. Little possessed the drugs at issue in Count 37 does not end our inquiry, however, because Mr. Little was also charged with aiding and abetting the distribution of narcotics on July 28, and the jury was instructed on an aiding and abetting theory. To convict under a theory of aiding and abetting, the Government must prove: (1) the substantive offense was committed; (2) the defendant contributed to and furthered the offense; and (3) the defendant intended to aid in its commission. United States v. Tagg, 572 F.3d 1320, 1324 (11th Cir. 2009). Additionally, our precedent provides that "in a prosecution for aiding and abetting possession of [narcotics] with intent to distribute, there must be evidence connecting the defendant with both aspects of the crime, possession and intent to distribute." United States v. Longoria, 569 F.2d 422, 425 (5th Cir. 1978).

Mr. Little does not contest that a substantive offense occurred here. Instead, he contends that the government cannot prove the remaining elements required to convict him on an aiding and abetting theory because "[m]ere presence is all the evidence showed in this transaction." Mr. Little's argument fails. As previously discussed, Mr. Little was aware of and involved in the conspiracy to distribute crack in Coconut Grove, along with Otis Walker[12] and Mr. Frederick. The audio and video recordings are definitive that after meeting each other on the street, Mr. Little walked the CI to Mr. Walker's house, where the CI requested that Mr. Little get Walker's attention. Mr. Little then knocked on Otis Walker's door, thereby initiating the transaction. When Mr. Walker opened the door, the CI asked if Walker "could help [him] out with something good," at which point Walker and the CI each entered the house, closing the door behind them. Once inside, the video shows the CI purchasing crack from Mr. Walker.

Viewed in the light most favorable to the government, it was reasonable for the jury to infer from this evidence that Mr. Little intentionally and successfully shepherded the CI to Mr. Walker's residence for the purpose of purchasing crack, and that a crack transaction was completed. This was enough to prove that Mr. Little intentionally "contributed to and furthered" Mr. Walker's possession and distribution of narcotics, see Tagg, 572 at 1324, and to connect him to each

---

[12] Mr. Walker was an indicted co-conspirator who testified at trial that he received crack from Mr. Burke and Mr. Frederick.

35

element of Walker's offense, see Longoria, 569 F.2d at 425. Therefore, the evidence was sufficient to convict Mr. Little of Count 37 on a theory that he aided and abetted the distribution of the drugs involved in that count.

> 2)    Count 38, Possession with Intent to Distribute Crack on August 3, 2009

Over Mr. Little's objection for lack of sufficient foundation, the government also introduced audio and video recordings of the alleged drug transaction between Little and the CI at the Bermuda Market on August 3, 2009. These recordings capture fragments of conversations between Mr. Little and the CI, the sound of money being counted, and Mr. Little's statement "I'll go get 14." After that, Mr. Little is seen walking away. Agents testified that soon after he walked away, he came back. Agents also testified that they later recovered fourteen dime bags of crack from the CI.

Mr. Little argues again here that the audio and video recordings should not have been admitted into evidence because the government failed to lay a proper foundation. For the reasons that follow, we find this argument to have merit.

For the August 3 transaction, the government offered little proof of the fidelity of the recording equipment. The extent of the evidence was Miami Police Officer Jose Mercedes's testimony that he gave the equipment to the CI before the buy, recovered it after the buy, and then gave it to a colleague for conversion to a CD. Although the government offered proof that agents independently observed

the meeting between the CI and Mr. Little, thus corroborating the video portion, neither Mr. Little nor the CI testified about this transaction and there was no independent testimony to corroborate the audio of the encounter. Because there was no testimony about the fidelity of the audio equipment, Sarro, 742 F.2d at 1292, and no independent evidence of the accuracy of the audio recordings, Biggins, 551 F.2d at 67, the District Court should not have admitted the audio portion of the tape. Compare United States v. Brown, 587 F.3d 1082, 1093 (11th Cir. 2009) ("[W]here the agent laying the foundation can testify he or she heard the original conversation that was being recorded and that it is the same as the one being played at trial, this also provides sufficient evidence of authenticity.").

Establishing that the district court abused its discretion in admitting the audio recording, however, is not the end of the inquiry.

> Even if [an evidentiary] ruling constitutes an abuse of discretion, it will result in reversal only if the error was not harmless. An error is harmless unless there is a reasonable likelihood that it affected the defendant's substantial rights. Stated another way, nonconstitutional error will be harmless unless the court concludes from the record as a whole that the error may have had a 'substantial influence' on the outcome of the proceeding.

United States v. Bradley, 644 F.3d 1213, 1270 (11th Cir. 2011) (quotation marks and citations omitted).

Here, we are not convinced that the District Court's admission of the audio had a substantial influence on the outcome of Mr. Little's case. This is because in

37

addition to the audio recording, the jury had: (1) the authenticated video recording of the meeting between Mr. Little and the CI; (2) the agents' testimony that they independently observed that meeting; and (3) the agents' testimony that they prepared the CI for a controlled buy from Mr. Little, and that after the meeting they recovered fourteen dime bags of crack from the CI.  In the light most favorable to the government, this evidence was sufficient to conclude that Mr. Little possessed and distributed the drugs at issue in Count 38.

We also reject Mr. Little's argument that the District Court erred in admitting the fourteen dime bags recovered from the CI on August 3 because this evidence was not relevant.  Evidence is relevant if it has any tendency to make the existence of any fact of consequence more or less probable than it would be without the evidence, Fed. R. Evid. 401, and relevant evidence is generally admissible, Fed. R. Evid. 402.  Here, the dime bags of crack recovered from the CI following the controlled buy were relevant because they tended to prove that Mr. Little possessed and distributed narcotics on August 3, as alleged in Count 38.

### c.    *Prosecutorial Misconduct*

Mr. Little also contends that the AUSA's closing argument was "so improper so as to warrant reversal."  Mr. Frederick joins this argument.  "Reversal on the basis of prosecutorial misconduct requires that the misconduct be so pronounced and persistent that it permeates the entire atmosphere of the trial."

United States v. Woods, 684 F.3d 1045, 1065 (11th Cir. 2012) (quotation marks omitted).  "For a claim of prosecutorial misconduct relating to the closing argument to be successful, the argument must be improper and prejudicial to a substantial right of the defendant."  Id. (quotation marks omitted).  "A defendant's substantial rights are prejudiced if there is a reasonable probability that, but for the improper remarks, the outcome of the trial would have been different."  Id.

Mr. Little and Mr. Frederick draw our attention to the following "inflammatory" remarks, limited to the AUSA's rebuttal argument: (1) "When deals are made in hell, there are no angels present.  And there are no angels in this case, not the witnesses, not the defendants"; and (2) "If [co-conspirators testifying for the government] are truthful and credible about one event, why are they untruthful and uncredible about another?  Solely because it incriminates them?  Well, that may be because they're the devils in hell together."

These remarks do not require us to reverse Mr. Little's and Mr. Frederick's convictions.  In context, it is clear that these remarks were not "intended to place [the defendants] on a demonic plane" as Mr. Little argues; instead they were offered to rebut defense counsels' assertions in closing argument that the government's witnesses lacked credibility.  In any event, there is little likelihood that "but for [these] improper remarks, the outcome of the trial would have been

39

different," given the weight of the evidence against Mr. Little and Mr. Frederick. Woods, 684 F.3d at 1065.

### d.    Cumulative Error

Finally, Mr. Little argues that his convictions should be reversed because cumulative error rendered his trial "fundamentally unfair." We are not persuaded. For reasons explained, the only errors alleged by Mr. Little that stand up to scrutiny are: (1) the District Court's admission of the audio recording of the August 3, drug transaction; and (2) the prosecutor's remarks on rebuttal. Individually, these errors were harmless as they related to Mr. Little's convictions, given the strength of the government's case. The cumulative effect of these errors on the jury's verdict was also harmless, given the length of the trial, and the strength of the government's case. See Baker, 432 F.3d at 1223 ("The total effect of the errors on the trial will depend, among other things, on the nature and number of the errors committed; their interrelationship, if any, and combined effect; how the district court dealt with the errors as they arose (including the efficacy—or lack of efficacy—of any remedial efforts); the strength of the government's case, and the length of trial.") (quotation marks and alteration omitted).

B.      SENTENCING PHASE

1.      Mr. Capers and Mr. Little

Mr. Little and Mr. Capers each argue that the District Court erred when it determined that the FSA did not apply to their respective sentencing guidelines calculations because their crimes were committed prior to the Act being passed on August 3, 2010. The government concedes that this was error, and we agree. See United States v. Hudson, 685 F.3d 1260, 1260–61 (11th Cir. 2012) (en banc). Therefore we vacate Mr. Little's and Mr. Capers's sentences and remand their cases for resentencing in light of the FSA.

## III.    CONCLUSION

In sum, we reach the following conclusions: (1) Mr. Frederick's convictions and sentences are affirmed; (2) Mr. Capers's convictions are affirmed, his sentences are vacated, and his case is remanded for resentencing under the FSA; (3) Mr. Little's convictions are affirmed, his sentences are vacated, and his case is also remanded for resentencing under the FSA.

For these reasons we

**AFFIRM** in part, **VACATE** in part, and **REMAND** for proceedings consistent with this opinion.

41